Nos. 24-560 and 24-7571

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

OKSANA B., ALEXANDER B., and A.B.,

*Plaintiffs-Appellees,*

v.

PREMERA BLUE CROSS, TABLEAU SOFTWARE, INC.
EMPLOYEE BENEFIT PLAN, and SALESFORCE.COM HEALTH
AND WELFARE PLAN,

*Defendants-Appellants.*

---

United States District Court for the Western District of Washington
Honorable Marsha J. Pechman
Case No. 2:22-cv-01517-MJP

---

APPELLANTS' OPENING BRIEF

---

ADAM H. CHARNES
KILPATRICK TOWNSEND &
 STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

GWENDOLYN C. PAYTON
JOHN R. NEELEMAN
KILPATRICK TOWNSEND &
 STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600
gpayton@ktslaw.com
jneeleman@ktslaw.com

*Counsel for Premera Blue Cross, Tableau Software, Inc. Employee
Benefit Plan, and Salesforce.com Health and Welfare Plan*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellants state as follows.

Premera Blue Cross, Tableau Software, Inc. Employee Benefit Plan, and Salesforce.Com Health and Welfare Plan are not publicly traded, they have no parent corporation, and no publicly held corporation owns 10 percent or more of their stock.

<u>s/ <i>Gwendolyn C. Payton</i></u>
GWENDOLYN C. PAYTON
KILPATRICK TOWNSEND &
 STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ............................................... i

TABLE OF CONTENTS ............................................................... ii

TABLE OF AUTHORITIES .......................................................... iv

INTRODUCTION ..................................................................... 1

STATEMENT OF JURISDICTION .................................................... 3

ISSUES PRESENTED FOR APPEAL ................................................. 4

STATEMENT OF THE CASE ......................................................... 4

A. The parties ................................................................ 4

B. A.B.'s stay at Second Nature. .......................................... 5

C. A.B.'s stay at Catalyst. ................................................. 8

D. The Plan covers medically necessary services and excludes wilderness programs. ....................................... 10

E. Premera determined that A.B.'s stay at Second Nature was not covered because the Plan does not cover wilderness programs. ..................................................... 14

F. Premera and independent psychiatrists concluded A.B.'s stay at Catalyst was not medically necessary. .......................... 17

G. Procedural history. ...................................................... 20

  1. Second Nature. ................................................ 21

  2. Catalyst. ......................................................... 21

  3. Attorneys' fees award and appeal. .......................... 22

SUMMARY OF ARGUMENT ....................................................... 23

STANDARD OF REVIEW..................................................................24

ARGUMENT ................................................................................25

I.    Premera did not abuse its discretion in applying the wilderness exclusion to Second Nature. ........................................25

    A.    Premera provided a reasoned explanation for its denial of the Second Nature claims. ....................................26

    B.    The district should have deferred to Premera's interpretation of the wilderness exclusion. ..........................29

II.    Premera's denial of the Members' Catalyst claim was not an abuse of discretion........................................................33

    A.    Premera's explanation for its denial was reasoned and adequate. ......................................................34

    B.    Premera did not abuse its discretion in finding that the Catalyst claim did not satisfy the Plan. ......................39

        1.    Catalyst did not provide sufficient levels of psychiatric care. ...........................................40

        2.    Premera did not abuse its discretion in concluding that A.B. could have been treated at a lower level of care. .................................45

        3.    The district court's reasons for rejecting Premera's decision are meritless. ...............................50

III.    The Court should reverse the district court's attorneys' fees award........................................................53

CONCLUSION ............................................................................54

REQUEST FOR ORAL ARGUMENT...................................................54

CERTIFICATE OF COMPLIANCE FOR BRIEFS

# TABLE OF AUTHORITIES

**Cases**

*Abatie v. Alta Health & Life Ins. Co.*,
    458 F.3d 955 (9th Cir. 2006) ........................................................28

*Alice F. v. Health Care Serv. Corp.*,
    367 F. Supp. 3d 817 (N.D. Ill. 2019) .......................................31, 32

*Ariana M. v. Humana Health Plan of Tex., Inc.*,
    No. H-14-3206, 2018 WL 4384162 (S.D. Tex. Sept. 14,
    2018), *aff'd*, 792 F. App'x 287 (5th Cir. 2019)................................53

*Autran v. Procter & Gamble Health & Long-Term Disability
    Benefit Plan*,
    27 F.4th 405 (6th Cir. 2022)...........................................................52

*Bendixen v. Standard Ins. Co.*,
    185 F.3d 939 (9th Cir. 1999) .........................................................24

*Black & Decker Disability Plan v. Nord*,
    538 U.S. 822 (2003) .......................................................................52

*Black v. Long Term Disability Ins.*,
    582 F.3d 738 (7th Cir. 2009) .........................................................52

*Booton v. Lockheed Med. Benefit Plan*,
    110 F.3d 1461 (9th Cir. 1997) ..................................................27, 37

*Chipman v. Cigna Behav. Health, Inc.*,
    480 F. Supp. 3d 174 (D.D.C. 2020), *aff'd*, No. 20-7094,
    2021 WL 5537709 (D.C. Cir. Nov. 23, 2021)..................................47

*Christine S. v. Blue Cross Blue Shield of N.M.*,
    No. 2:18-cv-00874-JNP-DBP, 2021 WL 4805136 (D. Utah
    Oct. 14, 2021)................................................................................53

*E.W. v. Health Net Life Ins. Co.*,
    86 F.4th 1265 (10th Cir. 2023).........................................38, 39, 43

*Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*,
663 F.3d 1124 (10th Cir. 2011) ..................................................... 47

*Feibusch v. Integrated Device Tech., Inc. Emp. Benefit Plan*,
463 F.3d 880 (9th Cir. 2006) ........................................................ 44

*Gannon v. Metro. Life Ins. Co.*,
360 F.3d 211 (1st Cir. 2004) ........................................................ 52

*Gilliam v. Nev. Power Co.*,
488 F.3d 1189 (9th Cir. 2007) ...................................................... 33

*Hardt v. Reliance Standard Life Ins. Co.*,
560 U.S. 242 (2010) ..................................................................... 54

*Hobson v. Metro. Life Ins. Co.*,
574 F.3d 75 (2d Cir. 2009) ........................................................... 28

*Jon N. v. Blue Cross Blue Shield of Mass.*,
684 F. Supp. 2d 190 (D. Mass. 2010) ........................................... 48

*Josef K. v. Cal. Physicians' Serv.*,
477 F. Supp. 3d 886 (N.D. Cal. 2020) .......................................... 47

*Julie L. v. Excellus Health Plan, Inc.*,
447 F. Supp. 3d 38 (W.D.N.Y. 2020) ........................................... 46

*Krysten C. v. Blue Shield of Cal.*,
721 F. App'x 645 (9th Cir. 2018) ................................................. 46

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) ........................................................ 39

*Peter B. v. Premera Blue Cross*,
No. C16-1904-JCC, 2017 WL 4843550 (W.D. Wash. Oct.
26, 2017) ...................................................................................... 50

*Pirkheim v. First Unum Life Ins.*,
229 F.3d 1008 (10th Cir. 2000) ......................................... 29, 30, 32

*Robertson v. Blue Cross & Blue Shield of Tex., Inc.*,
612 F. App'x 478 (9th Cir. 2015) ............................................... 30, 31

*S.L. ex rel. J.L. v. Premera Blue Cross*,
675 F. Supp. 3d 1138 (W.D. Wash. 2023) ..................................... 49

*Salomaa v. Honda Long Term Disability Plan*,
642 F.3d 666 (9th Cir. 2011) .......................................................... 43

*Saltarelli v. Bob Baker Grp. Med. Tr.*,
35 F.3d 382 (9th Cir. 1994) ............................................................ 30

*Simonia v. Glendale Nissan/Infiniti Disability Plan*,
608 F.3d 1118 (9th Cir. 2010) ........................................................ 54

*Stephan v. Unum Life Ins. Co. of Am.*,
697 F.3d 917 (9th Cir. 2012) .................................................... 24, 25

*Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*,
852 F.3d 105 (1st Cir. 2017) ..................................................... 40, 49

*Testa v. Hartford Life Ins. Co.*,
483 F. App'x 595 (2d Cir. 2012) ..................................................... 27

*US Airways, Inc. v. McCutchen*,
569 U.S. 88 (2013) ......................................................................... 32

*Varity Corp. v. Howe*,
516 U.S. 489 (1996) ....................................................................... 44

*Vaught v. Scottsdale Healthcare Corp. Health Plan*,
546 F.3d 620 (9th Cir. 2008) ......................................................... 43

*Warmenhoven v. NetApp, Inc.*,
13 F.4th 717 (9th Cir. 2021) .......................................................... 24

*Williby v. Aetna Life Ins. Co.*,
867 F.3d 1129 (9th Cir. 2017) ........................................... 25, 51, 52

vi

*Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr.,
Inc.,*
953 F.3d 1108 (9th Cir. 2020) ........................................39

**Statutes**

Employee Retirement Income Security Act of 1974, 29 U.S.C. §
1001, *et. seq.*............................................................4
1022(b) .......................................................................10
1132(a)(1)(B)........................................................3, 24
1132(a)(3) ....................................................................3
1132(e)(1) ....................................................................3
1132(g)(1) ............................................................22, 53

Mental Health Parity and Addiction Equity Act of 2008,
29 U.S.C. § 1185a .......................................................3

RCW 48.43.537 .................................................................16

28 U.S.C. §
1291 ...........................................................................3
1331 ...........................................................................3

**Regulations**

29 C.F.R. §
2560.503-1(g)(1)(i)-(ii)...............................................27
2560.503-1(h)(2)(iv) ..................................................43
2590.712(c)(4)(iii).....................................................39

45 C.F.R. § 147.136 ..........................................................16

WAC 284-43A-150 ...........................................................16

## INTRODUCTION

Plaintiffs-Appellees Oksana B. and Alexander B. (the "Members") claimed benefits from Defendant-Appellant Tableau Software, Inc. Employee Benefit Plan, an ERISA-governed plan. Specifically, they asked the Plan to cover room, board, and tuition for their son A.B.'s stays at Second Nature Wilderness Family Therapy and Catalyst Residential Treatment Center.

The third-party administrator, Defendant-Appellant Premera Blue Cross, denied the claims because the Plan excludes wilderness programs such as Second Nature, and A.B.'s stay at Catalyst was not medically necessary under the Plan's terms. Premera's denials were each upheld during administrative appeals, and as to Catalyst, again by a child and adolescent psychiatrist chosen by the Office of the Insurance Commissioner for the State of Washington—who was completely independent of Premera, and whose decision was binding on Premera.

The Members sued, and the district court found that Premera abused its discretion in denying the claim.

With respect to Second Nature, the court first relied on the fact that Second Nature provided therapy. But that is irrelevant: ERISA

requires the court to enforce the Plan as written, and the Plan categorically excludes wilderness programs—regardless of whether they provide therapy. The district court also found that Premera's explanation for denying the Second Nature claim was inadequate. The district court erred because Premera clearly explained that the Plan contractually excluded wilderness programs. ERISA required no additional explanation—nor was there anything else to say.

The district court largely did not reach the merits of the Members' claim for reimbursement for Catalyst. Instead, it awarded the Members benefits because it concluded that Premera's explanation for the denial was inadequate. But Premera provided the Members with a comprehensive explanation of the reasons for the denial. And Premera did not abuse its discretion in denying coverage: it is undisputed that Catalyst did not provide adequate psychiatric evaluations and sufficient levels of care required by the Plan, and A.B.'s condition could have been effectively treated at a lower level of care.

The Court should reverse the district court and hold that the Members are not entitled to any benefits for either Second Nature or Catalyst.

## STATEMENT OF JURISDICTION

Oksana B., Alexander B., and A.B. asserted a claim for benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B), and a claim under ERISA, 29 U.S.C. § 1132(a)(3), for violation of the Mental Health Parity and Addiction Equity Act of 2008 ("Parity Act"), 29 U.S.C. § 1185a.[1] 2-ER-121–128. The district court had federal-question jurisdiction over these claims. 28 U.S.C. § 1331; 29 U.S.C. § 1132(e)(1).

The district court entered final judgment, resolving all claims, on December 18, 2023. 1-ER-12–13. Appellants filed a timely notice of appeal on January 16, 2024. 2-ER-133–135. Moreover, the district court awarded the Members attorneys' fees on February 9, 2024. 1-ER-2–11. Appellants filed a timely notice of appeal from this order on February 12, 2024. 2-ER-130–132. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] The district court rejected the Parity Act claim as moot, 1-ER-37, and it is not at issue on appeal. The excerpts of record are cited as: [volume number]-ER-[page number(s)].

## ISSUES PRESENTED FOR APPEAL

1.     Whether the district court should have deferred to Premera's interpretation of the Plan's wilderness exclusion and its application to Second Nature.

2.     Whether Premera provided an adequate explanation for the denial of benefits for Second Nature and Catalyst.

3.     Whether the Court should uphold under the abuse of discretion standard Premera's decision that A.B.'s stay at Catalyst was not medically necessary.

4.     Whether, if this Court reverses the judgment, the Court should reverse the attorneys' fees award because the Members could not show any success on the merits.

## STATEMENT OF THE CASE

**A.     The parties.**

The Tableau Software, Inc. Medical Plan[2] is a self-funded employee welfare benefits plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, *et. seq.* Premera is the Plan's third-party claims administrator. 2-ER-108;

---

[2] Salesforce acquired Tableau Software in 2019, and the Members also sued the Salesforce Health and Welfare Plan. There is no dispute that the Tableau Plan governs the Members' entitlement to benefits.

3-ER-342. The Plan has delegated to Premera "the final discretionary authority to determine eligibility for benefits and construe the terms of the plan." 3-ER-342. And because the Plan is self-funded, the employer "is financially responsible for the payment of plan benefits." *Id.*

A.B. is a dependent of Plan Members Oksana B. and Alexander B. and is a beneficiary of the Plan. 2-ER-108. This litigation involves the Members' attempt to obtain coverage by the Plan for room, board, and tuition for A.B.'s stays at Second Nature Wilderness Family Therapy and Catalyst Residential Treatment Center.

## B. A.B.'s stay at Second Nature.

A.B. enrolled at Second Nature on February 6, 2019. 2-ER-108. No physician, psychiatrist, or psychologist recommended his admission there.

The parties agree that Second Nature is a wilderness program. Second Nature's name is "Second Nature Wilderness Family Therapy." 2-ER-43. The Members in their complaint and in their briefs repeatedly referred to it as a wilderness program. *See, e.g.*, 2-ER-113 ("Premera's reviewer appeared to have no experience or expertise with wilderness programs."); 2-ER-80 (the Members "requested that the next reviewer

have experience working in the outdoor behavioral health field, and if not that they contact Dr. Michael Gass, an expert who could explain how wilderness care was clinical in nature, evidence-based, and proven to be effective.").

Second Nature's website explains that it provides a "wilderness family therapy program" and describes its program as "outdoor adventure therapy" using a "nomadic backpacking approach…." 2-ER-43; 2-ER-52. Second Nature repeatedly identifies itself as a "wilderness program" or as providing "wilderness therapy." 2-ER-43 ("Second Nature is the industry's most trusted and sophisticated wilderness therapy program…."); 2-ER-47 ("Should I pull my child out of school for wilderness therapy?"); 2-ER-51 ("Wilderness Therapy at Second Nature"); *id.* ("Second Nature was the first wilderness program to employ a therapist-driven model."); *id.* ("Adolescent Wilderness Therapy Program").[3] Second Nature is licensed by the State of Utah as an "Outdoor Youth Treatment" facility. 3-ER-333.

In a "Master Treatment Plan" dated February 19, 2019, camp director Devan Glissmeyer noted several therapeutic goals for A.B., but

---

[3] Capitalization was changed for readability in some of these quotations.

6

his planned "[i]nterventions" did not include any psychiatric treatments or medication. 3-ER-175–181. For example, to address A.B.'s "Depressive Disorder," the Master Treatment Plan prescribed no consultation with a psychiatrist for treatment or possible anti-depressant medication. Instead, the Master Treatment Plan prescribed such activities as journaling, hiking, "daily self-affirmations," and receipt of "positive feedback" by staff and other students. 3-ER-176–177. Handwritten "Session Notes" from Glissmeyer documented weekly therapy sessions—but none stated that A.B. received any psychiatric treatment. 3-ER-182–195. None of the session notes reflect any concerns about suicide, self-harm, or risk of harm to others.

Glissmeyer prepared a "Discharge Summary" when A.B. left Second Nature on June 3, 2019. 3-ER-172–174. The report did not state that A.B. was clinically depressed, suffered from any other illness requiring psychiatric care, or posed any risk of self-harm, suicide, or harm to others. *Id.*

7

**C.    A.B.'s stay at Catalyst.**

A.B. transferred from Second Nature to Catalyst on June 3, 2019. 2-ER-108. No physician or psychiatrist recommended A.B.'s enrollment there.

Catalyst's website states that its program provides a "mix of therapy, recreation, art, music, academics, and experiential opportunities…." 2-ER-59. Catalyst advertises "a minimum of 15 hours of therapeutic treatment weekly"; however, the posted daily schedule allots only 1.5 hours to therapeutic activities. 2-ER-63; 2-ER-73. Catalyst has a Utah "Residential Treatment" license. 3-ER-171.

A "Nursing Assessment" signed by Karen Miller on June 4, 2019, documented A.B.'s condition upon admission. 3-ER-287–297. The report cataloged his previous use of various substances and his physical condition. The report also documented that A.B. experienced no hallucinations or delusions, and it did not indicate any risk of self-harm, suicide, or harm to others. 3-ER-296. And it stated that A.B.'s only previous "psychiatric diagnosis" was "ADHD," and his previous mental health treatments were for "[s]ubstance abuse, selling substances, defiance and disrespect towards parents," "[f]amily issues and conflict,"

and "suspension from school"—not depression or suicidal ideation. 3-ER-290.

On June 10, 2019, a Catalyst staff member, Meghan Kunz, a psychiatric mental-health nurse practitioner, created a "Psychiatric Medication Evaluation" for A.B. 3-ER-298–301. The evaluation described his "Present Illness" as "Drug use/dealing drugs, a lot of disrespect towards parents, and isolation." 3-ER-298. The report noted diagnoses of anxiety disorder, depressive disorder, ADHD, and cannabis use disorder. 3-ER-301. But the report stated that A.B. would not be prescribed any psychiatric medications. *Id.*

The record contains numerous "Progress Notes" from Catalyst's individual and family therapy sessions—all are signed by therapist Blake Altom, and all state "None" for "self-harm/suicide risk" and "danger risk." *See*, *e.g.*, 3-ER-198–206; 3-ER-281–282.

Catalyst's records also contain "Daily Logs" signed by Catalyst Program Director Larry Sund and others. *See*, *e.g.*, 3-ER-207–264. None of these documents reported that A.B. was hallucinating, delusional, or posed a risk of self-harm, suicide, or harm to others.

9

A.B. stayed at Catalyst for more than one year—from June 3, 2019, to about July 29, 2020, when he reenrolled at Second Nature until October 16, 2020. 2-ER-114. A.B.'s second stay at Second Nature is not at issue in this litigation.

## D. The Plan covers medically necessary services and excludes wilderness programs.

The Plan covers medically necessary behavioral health treatments for members such as A.B., including residential treatment, partial hospitalization, intensive outpatient, and outpatient counseling. 3-ER-341–412; 4-ER-415–428. The Summary Plan Description ("SPD") is the Plan document that governs the terms of benefits provided by the Plan. *See* 29 U.S.C. § 1022(b). Here, the SPD defines "Medically Necessary" as follows:

> Those covered services and supplies that a physician, exercising prudent clinical judgment, would provide to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury, disease or its symptoms, and that are:
>
> - In accordance with generally accepted standards of medical practice;
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease; and
> - Not primarily for the convenience of the patient, physician, or other health care provider, and not more

costly than an alternative service or sequence of services
at least as likely to produce equivalent therapeutic or
diagnostic results as to the diagnosis or treatment of that
patient's illness, injury or disease.

For these purposes, "generally accepted standards of medical
practice" means standards that are based on credible
scientific evidence published in peer reviewed medical
literature generally recognized by the relevant medical
community, physician specialty society recommendations
and the views of physicians practicing in relevant clinical
areas and any other relevant factors.

4-ER-424.

The SPD excludes "[s]ervices or supplies that are not medically
necessary," and it specifically explains that "recreational, camp and
activity-based programs … are not medically necessary…." 3-ER-396.
A Plan exclusion in the SPD expressly provides that **"[t]he Mental
Health Care benefit doesn't cover**: … Outward bound, wilderness,
camping or tall ship programs or activities." 3-ER-375 (bold in the
original).

The SPD states that "Premera Blue Cross has developed or
adopted guidelines and medical policies that outline clinical criteria
used to make medical necessity determinations." 3-ER-393. Premera
utilized *InterQual 2019 BH: Child and Adolescent Psychiatry*, evidence-

11

based care guidelines for healthcare and government organizations.
4-ER-429–524.

The InterQual Criteria address two issues in evaluating medical
necessity: (1) do the patient's symptoms require residential treatment?
and (2) does the facility provide mental health care adequate for a
patient requiring residential treatment? Both questions must be
answered in the affirmative for residential treatment to be medically
necessary under the Plan.

*First,* the Criteria identify symptoms that—if they exist and
persist—would make residential treatment medically necessary for a
patient. At least one of the following symptoms must be present:

- Persistent or repetitive over at least 6 months
- Unable to be managed safely within the community, ≥
  **One:**
  - Aggression unresponsive to adult de-escalation or
    direction
  - Angry outbursts causing harm to self or others or
    property
  - Daredevil behavior
  - Delusions
  - Disorganized thoughts or speech or behavior
  - Fire setting
  - Hallucinations
  - Hypomanic symptoms increased
  - Nonsuicidal self-injury
  - Persistent violation of court orders

12

- o Poor impulse control with harm to self or others and unresponsive to adult intervention
- o Repeated arrest or confirmed illegal activity
- o Runaway for more than 24 hours and places self in dangerous situations
- o Sexually inappropriate or abusive

4-ER-452–453 (footnotes omitted). Additionally, the patient must exhibit one of the following symptoms within the last week:

- Symptom within last week, ≥ **One:**
  - o Aggressive or assaultive behavior
  - o Angry outbursts
  - o Depersonalization or derealization
  - o Destruction of property
  - o Easily frustrated and poor impulse control
  - o Homicidal ideation without intent
  - o Hypervigilance or paranoia
  - o Nonsuicidal self-injury
  - o Persistent rule violations
  - o Psychiatric medication refractory or resistant and symptoms increasing or persisting, ≥ **One:**
    - Anxiety and associated symptom
    - Depressive disorder or major depressive episode and associated symptoms
    - Hypomanic symptom
    - Obsessive or compulsive disorder
    - Psychosis and associated symptom
  - o Psychomotor agitation or retardation
  - o Runaway from facility or while on home pass
  - o Sexually inappropriate
  - o Suicidal ideation without intent

4-ER-454 (footnotes omitted).

13

*Second*, the InterQual Criteria identify a base level of mental health care services that a residential treatment facility must provide. The patient must receive a psychiatric evaluation within 24 hours of admission and undergo weekly psychiatric evaluations thereafter; the facility must establish a discharge plan within 24 hours of admission; and the facility must provide daily clinical assessments and therapy at least three times per week. 4-ER-455; 4-ER-509.

In sum, these standards ensure that adolescent patients confined to residential treatment both exhibit symptoms of a severity requiring 24/7 confinement away from their community and that the facility itself provides adequate mental health treatment.

## E. Premera determined that A.B.'s stay at Second Nature was not covered because the Plan does not cover wilderness programs.

The Members submitted claims to Premera for A.B.'s stay at Second Nature. Premera determined that the service was not covered under the plain terms of the Plan, because the SPD excludes wilderness programs. 3-ER-332. The Members submitted a Level I appeal, 3-ER-325–331, arguing that Second Nature falls within the Plan's "Provider" definition since it is "duly licensed by the state of Utah as an

intermediate behavioral health treatment program for children and adolescents," 3-ER-328. Premera sent the appeal to an independent external physician reviewer, board-certified in child and adolescent psychiatry, and not affiliated with Premera. 3-ER-322–324. The psychiatrist, noting that neither the Members nor Second Nature provided any "clinical information," confirmed that Premera correctly "denied coverage" because Second Nature "is a wilderness program" and, "[a]ccording to the terms of your health plan, wilderness programs are an exclusion from coverage." 3-ER-323.

Premera responded to the Level I appeal, upholding its determination: "The information we have received shows that this program is a wilderness program. According to the terms of your health plan, wilderness programs are an exclusion from coverage." 3-ER-321. Premera explained that the Plan "does allow coverage for medically necessary treatments, such as mental health counseling, from an eligible, licensed provider" at Second Nature, and encouraged the Members to submit claims for any therapy received at Second Nature. *Id.*

The Members submitted a Level II appeal. 3-ER-302–320. Their appeal argued that wilderness programs provided "medically necessary" services, but wholly ignored the Plan's exclusion of such programs. 3-ER-312–313. The appeal panel upheld Premera's determination. The panel explained that "the contract language … specifically excludes coverage on wilderness therapy," and Second Nature "is licensed as a wilderness treatment program in the state of Utah." 4-ER-534. Premera also explained that the records the Members provided showed both that A.B. lacked the severity of symptoms justifying residential treatment and that Second Nature failed to provide the intensity of services to constitute residential treatment. *Id.*

Premera told the Members they could request external review by an Independent Review Organization ("IRO"). 4-ER-534–535. Washington and federal law mandate the availability of IRO review, and the results are binding on Premera. *See* 4-ER-417; 45 C.F.R. § 147.136; RCW 48.43.537; WAC 284-43A-150. The Members did not request an IRO review.

**F.    Premera and independent psychiatrists concluded A.B.'s stay at Catalyst was not medically necessary.**

Premera initially covered A.B.'s first 30 days at Catalyst. 2-ER-115. After reviewing A.B.'s records from Catalyst, however, Premera concluded his continued stay at this facility was not medically necessary. Premera explained that A.B.'s condition did not meet the InterQual Criteria for continued confinement in residential treatment. 4-ER-531–532. Premera also explained that Catalyst did not provide the medically necessary level of treatment: "The information from your provider does not show any psychiatric evaluations, does not show daily clinical assessments by licensed providers, and does not show any discharge planning." 4-ER-532. Premera further noted that Catalyst's records did not show A.B. was receiving therapy at least three times per week. *Id.* Premera cited the InterQual Criteria and the Plan, and notified the Members they could appeal. *Id.*

The Members submitted a Level I appeal. 3-ER-157–170. The Members included records from Catalyst and a letter from therapist Jovana Radovic Wood, who saw A.B. months before his admission to Catalyst—from January 2017 until February 2019 (he started at Catalyst in June 2019). 3-ER-196–197. Wood's letter is dated September

17

5, 2019—four months after A.B. enrolled at Catalyst—and says she recommended A.B. enroll at Second Nature. 3-ER-197. Wood notes— notably, using the passive voice—that "further recommendation was given for [A.B.] to continue with an after-care program," but does not say *she* recommended A.B. enroll at Catalyst. *Id.*

Premera submitted the Members' Level I appeal to an independent board-certified child and adolescent psychiatrist. 3-ER-336–339. The psychiatrist began by summarizing A.B.'s relevant history and the documentation from Catalyst, noting that Catalyst repeatedly documented the lack of "self-harm or suicide risk." 3-ER-337–338. The psychiatrist then found:

> The patient is diagnosed with major depressive disorder, recurrent, severe, without psychotic features. As of 7/2/19, the patient was not reported to be suicidal, homicidal, or gravely impaired for self-care. There was no report of self harm. The patient did not report any auditory or visual hallucinations. The patient was compliant with treatment and was attending individual and family therapy sessions. He had family support. The patient did not have any severe symptoms that required 24-hour nursing supervision.

3-ER-339. For these reasons, the psychiatrist determined that "the patient could have been treated in a lower level of care, such as partial hospitalization," so "the request for continued residential treatment

18

from 7/2/19 to discharge is not medically necessary." *Id.* In short, the psychiatrist found that Catalyst was not "[c]linically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease." 3-ER-338.

In light of this independent report, Premera denied the claim. Premera explained to the Members that continued care at Catalyst was "not medically necessary … based on accepted medical standards" and "based on the plan terms from the Summary Plan Description." 3-ER-334. Specifically, Premera explained:

> You were not wanting to harm yourself or others. You were not hearing or seeing things that were not there. You were not so severely disturbed in thinking to require 24-hour nursing supervision. You continued to make progress in your treatment that could have allowed you to be treated in a lower level of care, such as partial hospitalization.

*Id.* Premera told the Members they could submit additional information for review that "may change our decision," and informed them that they could request external review by an IRO. 3-ER-334–335.

The Members requested an IRO review. 3-ER-144–156. The IRO reviewer, a board-certified child and adolescent psychiatrist, reviewed the entire record "to determine if the adverse determination was appropriate." 4-ER-525. The IRO psychiatrist agreed with Premera's

19

denial of the claims. 4-ER-525–529. The IRO psychiatrist recognized that A.B. had a "history of alcohol and substance abuse, parent-child relationship issues, and depression." 4-ER-528. But the IRO psychiatrist found "no documentation that the claimant demonstrated any disorganized behavioral problems requiring 24 hours supervision, no homicidal or suicidal ideation, no hallucinations, no psychotic behavior, and no inten[t]ions of harm to others or himself." *Id.* For this reason, the IRO psychiatrist determined that "the claimant's condition could have been managed appropriately at a lower level of care such as Intensive Outpatient Program (IOP), aggressive medication management, and group therapy for adolescents as outpatient." 4-ER-528–529. Accordingly, he found that treatment at Catalyst after July 2, 2019, "is not medically necessary and appropriate." 4-ER-529.

## G. Procedural history.

The Members filed this lawsuit. Upon cross motions for judgment, the district court awarded the Members benefits for the Second Nature wilderness program and residential treatment at Catalyst.

20

### 1. Second Nature.

The district court's decision to grant benefits for A.B.'s stay at Second Nature has two parts. *First*, the court concluded that Premera "fail[ed] to provide a reasoned explanation of its Plan construction." 1-ER-30. Specifically, the court held that "[n]one of the denials provides anything more than a conclusory explanation of why Premera construed the exclusion to apply to the mental healthcare services Second Nature provided." *Id. Second*, the court concluded that Premera read the exclusion of "wilderness programs" too broadly, finding that Premera's reading "conflicts with the plain language of the Plan." *Id*. The court instead interpreted the exclusion as "a narrow exclusion for recreational activities that do not expressly reach mental healthcare providers who treat patients in an outdoor setting." *Id*.

### 2. Catalyst.

The court granted benefits for A.B.'s stay at Catalyst because it found Premera's explanation for denying the benefits inadequate. The court opined that "Premera's medical necessity determinations fail to explain how, given … A.B.'s specific history and his treating therapists' recommendations, he had recovered sufficiently from his conditions

upon initial entry after thirty days that continued care was no longer necessary at Catalyst." 1-ER-32–33. The court found the first two denials "lack[ed] any justifiable explanation" and "any reasoned analysis," and the IRO opinion "fail[ed] to explain why A.B.'s continued stay was not medically necessary in light of his medical history and his treating providers' recommendation." 1-ER-33–34.

Finally, the district court "reject[ed] Premera's argument that it reasonably denied coverage because Catalyst did not meet the facility-specific requirements to qualify for coverage." 1-ER-37. The court found that, though Premera relied on this basis in its initial denial, it "abandoned this reasoning" in the Level I and II appeals.[4] *Id.*

### 3. Attorneys' fees award and appeal.

After entering judgment for the Members, 1-ER-12–13, the court granted their motion for attorneys' fees under ERISA, 29 U.S.C. § 1132(g)(1). 1-ER-2–11. Premera appealed both the judgment and the fee award. 2-ER-130–135. This Court consolidated both appeals. Order (Feb. 26, 2024).

---

[4] Despite the Court's assertion, the Members did not file a Level II appeal of their Catalyst claims. The district court also denied as moot the Members' Parity Act claims. 1-ER-37.

## SUMMARY OF ARGUMENT

This Court should reverse the judgment.

*First*, the district court erred with respect to both reasons it gave for awarding benefits for A.B.'s stay at Second Nature. The district court claimed that, because Second Nature provides therapy, it is covered by the Plan. But the Plan categorically excludes wilderness programs *even if* such programs provide therapy. (As Premera explained to the Members, any therapy provided would be covered, but not the room, board, and tuition at the wilderness program.) Moreover, the district court's holding that Premera failed to provide an adequate explanation is erroneous. Premera clearly explained that it denied the claims because the Plan contractually excluded wilderness programs. This explanation complied with ERISA.

*Second*, with respect to Catalyst, Premera's explanation for the denial of the claim also satisfied ERISA. Premera explained that A.B.'s stay at Catalyst failed to meet the InterQual Criteria, and during the appeal process the Members failed to address Premera's reasons for denying the claim. Further, Premera did not abuse its discretion in determining that treatment at Catalyst was not medically necessary for

two independent reasons: Catalyst failed to provide sufficient services to A.B., and A.B.'s condition could have been treated in a less intensive setting, such as partial hospitalization.

Because the Court should reverse the judgment for the Members, it should also reverse the attorneys' fees award.

## STANDARD OF REVIEW

The district court resolved the Members' claim for benefits based on cross motions for judgment. In ERISA cases, "a motion for summary judgment is merely the conduit to bring the legal question before the district court and the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999). "The plaintiff bears the burden of proof on a § 1132(a)(1)(B) claim." *Warmenhoven v. NetApp, Inc.*, 13 F.4th 717, 722 (9th Cir. 2021).

Because the Plan granted discretionary authority to Premera, 3-ER-342, the district court properly reviewed Premera's denial of the claims for an abuse of discretion. *See Stephan v. Unum Life Ins. Co. of Am.*, 697 F.3d 917, 928–29 (9th Cir. 2012). Both parties agreed below that this standard applied. 1-ER-26.

24

The abuse of discretion standard is "deferential," and a plan administrator's decision "will not be disturbed if reasonable." *Stephan*, 697 F.3d at 929. Specifically, under this standard, the court will overrule the administrator only if its decision is "(1) illogical, (2) implausible, or (3) without support in inferences that may be drawn from the facts in the record." *Id.*

"Whether an ERISA plan administrator abused its discretion is a legal determination that [this Court] review[s] de novo." *Williby v. Aetna Life Ins. Co.*, 867 F.3d 1129, 1137 (9th Cir. 2017). This court, therefore, does not defer to the district court's findings or conclusions.

## ARGUMENT

### I. Premera did not abuse its discretion in applying the wilderness exclusion to Second Nature.

The district court held that Premera abused its discretion in denying the Members' claim for the Second Nature wilderness program. The court's opinion seems to rest on two interrelated grounds: (1) Premera "fail[ed] to provide a reasoned explanation of its Plan construction"; and (2) Premera erred in interpreting the wilderness exclusion in the Plan to include "mental healthcare facilities that provide care in an outdoor or wilderness setting," rather than just a

facility that is "merely a provider of outdoor recreation." 1-ER-27–30.

Both holdings ignore the standard of review—abuse of discretion—and

both are wrong.

### A. Premera provided a reasoned explanation for its denial of the Second Nature claims.

Premera's explanations of its denial were wholly adequate and

reasoned, particularly when viewed through the abuse of discretion

standard. Premera explained to the Members—repeatedly—that Second

Nature was a wilderness program and the SPD provided that

"wilderness programs are an exclusion from coverage." 3-ER-321.

Premera specifically explained that "Premera does not cover …

wilderness programs, regardless of the nature of the facility associated

with the wilderness program." *Id.* Premera included the report of an

external physician reviewer, board-certified in child and adolescent

psychiatry, who agreed with Premera that "wilderness programs are an

excluded service" under the health plan. 3-ER-323.

In response to the Members' Level II appeal, Premera explained

that the claim was denied "based on the contract language which

specifically excludes coverage on wilderness therapy. The

documentation provided shows that this facility is licensed as a

wilderness treatment program in the state of Utah; and the benefit contract clearly states that this type of facility is not covered under the plan." 4-ER-534. And there is no dispute that Second Nature *is* a wilderness program. *See supra,* pp. 12–13. Premera's explanations, therefore, were comprehensive and reasoned; indeed, the district court never explained what *more* it expected Premera to say.

Premera's communications, moreover, fully satisfied ERISA's regulations. With respect to the reason for the denial, those regulations required Premera to explain, "in a manner calculated to be understood by the claimant," "[t]he specific reason or reasons for the adverse determination" and "[r]eference … the specific plan provisions on which the determination is based." 29 C.F.R. § 2560.503-1(g)(1)(i)-(ii); *see Testa v. Hartford Life Ins. Co.*, 483 F. App'x 595, 597 (2d Cir. 2012). As this Court has explained, "[i]f benefits are denied in whole or in part, the reason for the denial must be stated in reasonably clear language, with specific reference to the plan provisions that form the basis for the denial." *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997). "[T]he purpose of ERISA's notice requirement is to 'provide claimants with enough information to prepare adequately for further

administrative review or an appeal to the federal courts.'" *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 87 (2d Cir. 2009). Premera's notice certainly fulfilled that purpose. *See, e.g., Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006) (holding that the administrator "provide[d] [Plaintiff] with adequate notice of the reasons for denial," and nothing "preclude[d] [Plaintiff] from responding to that rationale for denial at the administrative level…").

Indeed, the record shows that the Members completely understood Premera's decision and rationale, and they submitted administrative appeals expressly stating that they understood the reason for Premera's denial. In the appeals, the Members asked Premera to consult with an expert who studies wilderness programs. 3-ER-310; 3-ER-327. In their second-level appeal, the Members attached Premera's denial of the previous appeal and the independent medical opinion, both of which expressly relied on the wilderness exclusion. 3-ER-302. Indeed, the appeal letter *expressly quoted* language explaining that the denial was based on the wilderness exclusion: "What Premera does not cover is wilderness programs."[5] 3-ER-308. The district court never explained

---

[5] Notably, even though the Members acknowledged that Premera based

28

how Premera's communications were inadequate when the Members clearly understood the basis for the denial.

## B. The district should have deferred to Premera's interpretation of the wilderness exclusion.

Premera's interpretation of the wilderness exclusion did not abuse its discretion. The district court concluded that "Premera's reading of the Plan conflicts with the Plan's language that provides a narrow exclusion for recreational activities that do not expressly reach mental healthcare providers who treat patients in an outdoor setting." 1-ER-30. In other words, the district court concluded that the exclusion did not apply to wilderness facilities that provided therapy.

But the district court misapprehended the meaning and operation of an insurance contract's exclusion. Because there is no dispute that Second Nature is a "wilderness program," the district court was bound to enforce the SPD's wilderness exclusion. The SPD has (1) insuring clauses and (2) exclusions that determine coverage. *Pirkheim v. First Unum Life Ins.*, 229 F.3d 1008, 1011 (10th Cir. 2000) (holding that the

---

the denial on the wilderness exclusion, their appeal letter never argued that the exclusion did not apply to their Second Nature claims. Instead, they argued that the services provided at Second Nature were medically necessary without addressing the wilderness exclusion at all. 3-ER-312–314.

29

court must enforce the SPD "[w]here the insuring clause or exclusionary provision is conspicuous, clear, and unequivocal") (footnote omitted). The Court must enforce the SPD's exclusions. *Id.* Exclusions function to automatically bar coverage *regardless* of whether the treatment is medically necessary or benefits a patient. *Robertson v. Blue Cross & Blue Shield of Tex., Inc.*, 612 F. App'x 478, 479–80 (9th Cir. 2015) ("Given the clarity of the applicable exclusion, '[w]e cannot say ... that [Blue Cross's] interpretation of [the Plan] is not reasonable, even when examined in the context of' the Plan as a whole, evidence that the treatment may be medically necessary, and Texas law.").

By definition, therefore, an exclusion automatically bars coverage *even if* the treatment is otherwise medically necessary or benefits the patient. And the court must enforce plan exclusions that are "clear, plain, and conspicuous," *Saltarelli v. Bob Baker Grp. Med. Tr.*, 35 F.3d 382, 387 (9th Cir. 1994)—as the wilderness exclusion in the Plan is: the Plan states that "[t]he Mental Health Care benefit doesn't cover: … Outward bound, wilderness, camping or tall ship programs or activities." 3-ER-375.

This Court's decision in *Robertson* illustrates how a contractual exclusion should apply. The plan in *Robertson* excluded "treatment provided as part of a clinical trial." 612 F. App'x at 479. This Court permitted Blue Cross to enforce this exclusion even though the claimant presented "evidence that the treatment may be medically necessary." *Id.* at 480. "While this is a sympathetic case," this Court noted, the claimant "is not entitled to receive the coverage she seeks from Blue Cross and [her employer] because it is not required by the plain language of the Plan as reasonably interpreted by Blue Cross." *Id.*

In *Alice F. v. Health Care Serv. Corp.*, 367 F. Supp. 3d 817 (N.D. Ill. 2019), the court also addressed a claim for the Second Nature wilderness program. The court explained that Second Nature did not provide "therapeutic intervention in a controlled environment, medical monitoring, and 24-hour onsite nursing," but "merely a supportive environment and methods to address social needs." *Id.* at 828. The court also explained that Second Nature was not licensed to provide the residential treatment center services covered by the plan, but instead "it has a license to perform different, noncovered services." *Id.* at 827. In

31

light of the exclusion, the court held that "it is ineligible for coverage under the terms of the Plan." *Id.*

Because of the exclusion, A.B.'s stay at the Second Nature wilderness program was not covered regardless of any therapy or benefit that A.B. received there. "ERISA's principal function [is] to protect contractually defined benefits." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 100 (2013) (internal quotations and citations omitted); *see also Pirkheim*, 229 F.3d at 1011 (courts must enforce insuring clauses and exclusions). The contract here—as explained in the SPD—categorically and clearly excluded otherwise covered treatments provided by wilderness programs. At the least, Premera's interpretation of that exclusion did not abuse its discretion. And ERISA required the district court to enforce that exclusion as written.

Further, nothing in the language of the exclusion supports the district court's interpretation, let alone establishes that Premera's contrary interpretation abused its discretion. The court believed that the exclusion applied only to facilities that provided no therapy or other covered services. But that interpretation makes no sense. In the absence of therapy or other covered services, Second Nature's services

would not be covered at all, and the exclusion would have no effect. This interpretation therefore violates the principle that an ERISA plan should be interpreted so "no provision is rendered nugatory." *Gilliam v. Nev. Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007).

Accordingly, the district court erred in awarding the Members benefits for A.B.'s stay at Second Nature.

## II. Premera's denial of the Members' Catalyst claim was not an abuse of discretion.

As with the Second Nature claim, the district court held that Premera "fail[ed] to provide a reasoned decision" with respect to Catalyst. 1-ER-35. The court also held that Premera did not "reasonably den[y] coverage." 1-ER-37. Although the court found that, during the administrative appeals, Premera "abandoned" its finding that Catalyst did not meet the facility-specific requirements, *id.*, it never substantively addressed Premera's alternative finding that A.B.'s condition did not require residential treatment.

This Court should reverse these holdings. Once again, Premera communicated to the Members an understandable, comprehensive explanation of the reason for the denial. And Premera did not abuse its discretion in denying coverage: Catalyst did not provide adequate

33

psychiatric evaluations and sufficient levels of care required by the Plan, and A.B.'s condition could have been effectively treated at a lower level of care. The Members' claim received multiple levels of review by independent physicians, underscoring the reasonableness of Premera's decision. And Premera never waived any of its grounds for denial of the claim.

## A. Premera's explanation for its denial was reasoned and adequate.

The district court held that Premera's explanation for its denial of the Members' Catalyst claim was inadequate. This holding was error.

After reviewing A.B.'s records from Catalyst, Premera's initial denial explained that his continued stay at this facility was not medically necessary. 4-ER-531–532. With respect to A.B.'s condition, Premera explained that coverage is allowed only when, "because of a serious emotional disturbance," one of the following was true over the last week: "You have been having angry outbursts"; "You have hurt or tried to hurt others or have thoughts about killing others"; "You have hurt yourself or have thoughts about killing yourself"; or "You have destroyed property, or you are having other very serious psychiatric symptoms." 4-ER-531. If one of those conditions were present, Premera

34

explained, then coverage is permissible only if one of the following was *also* true: "You have very bad relationships with other people"; "You are interacting with others in very angry or threatening ways"; or "You can't or won't follow instructions or ask for help to get your needs met." 4-ER-532. Premera stated that it denied coverage because "[i]nformation from your provider does not show any of the situations above." *Id.*

With respect to the services provided by Catalyst, Premera explained that the Plan required that the facility provide (1) a "psychiatric evaluation … at least one time per week," (2) a "[c]linical assessment by a licensed provider … at least one time per day," (3) therapy at least three times per week," and (4) "[p]reliminary discharge planning" that began within 24 hours of admission. *Id.* Premera explained that Catalyst failed to satisfy these conditions: "The information from your provider does not show any psychiatric evaluations, does not show daily clinical assessments by licensed providers, and does not show any discharge planning." *Id.* Premera also noted that Catalyst's records did not show A.B. was receiving therapy at

least three times per week. *Id.* Premera cited the InterQual Criteria and the Plan, and notified the Members that they could appeal. *Id.*

Premera's denial of the Members' Level I appeal was similarly detailed and reasoned. Premera explained: "You were not wanting to harm yourself or others. You were not hearing or seeing things that were not there. You were not so severely disturbed in thinking to require 24-hour nursing supervision." 3-ER-334. Accordingly, Premera explained, A.B. could have been "treated in a lower level of care, such as partial hospitalization." *Id.*

Premera also submitted the Level I appeal to an independent board-certified child and adolescent psychiatrist. The psychiatrist agreed with Premera, citing the InterQual Criteria, and explained in detail that A.B. exhibited none of the symptoms required by the InterQual Criteria. 3-ER-336–339. Specifically, the psychiatrist explained that "the patient was not reported to be suicidal, homicidal, or gravely impaired for self-care" and there was "no report of self harm." 3-ER-339. A.B. experienced no hallucinations, was "compliant with treatment," "had family support," and "did not have any severe symptoms that required 24-hour nursing supervision." *Id.* Thus, the

psychiatrist concluded that A.B. "could have been treated in a lower level of care, such as partial hospitalization." *Id.* Premera provided the psychiatrist's report to the Members with the denial of their appeal.

The IRO is completely independent from Premera, and the IRO psychiatrist's explanation was similarly reasoned: "there is no documentation that the claimant demonstrated any disorganized behavioral problems requiring 24 hours supervision, no homicidal or suicidal ideation, no hallucinations, no psychotic behavior, and no inten[t]ions of harm to others or himself." 4-ER-528. The IRO psychiatrist therefore concluded that A.B.'s "condition could have been managed appropriately at a lower level of care." *Id.*

These explanations more than satisfied this Court's requirement that Premera provide "the reason for the denial . . . in reasonably clear language." *Booton*, 110 F.3d at 1463.

Recently, the Tenth Circuit found reasonable an administrator's decision denying a claim based on the InterQual Criteria. The administrator's justification for its conclusion mirrors Premera's explanation here:

> Health Net's letters cited to the specific diagnostic criteria—
> the InterQual Criteria—that it considers when determining

37

whether to continue coverage for care at a residential treatment center. . . . "Based on the clinical information provided to [Health Net]," it concluded I.W. had not exhibited any of the symptoms or behaviors within the relevant timeframe that are required to qualify for continued coverage under the InterQual Criteria. . . . Thus, Health Net explained the basis for its decision to deny coverage in a reasoned manner. The absence of symptoms or behaviors required to establish medical necessity under the InterQual Criteria necessarily implies that I.W. no longer qualified for continued coverage under Health Net's standard. And because Health Net determined I.W. did not satisfy its criteria for continued coverage, ... its analysis "could [not] have also supported a finding" that "ongoing treatment" was medically necessary under those same criteria.

*E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1301 (10th Cir. 2023) (citations omitted).

The Tenth Circuit explained that Health Net did not need to "provide extensive citations to I.W.'s medical records," because "its findings derived primarily from the absence of record evidence supporting continued coverage." *Id.* "Plaintiffs fail[ed] to explain what evidence Health Net could have cited to support its conclusion that I.W. did not exhibit the requisite symptoms or behaviors." *Id.* The same is true here: Premera pointed to the absence of "the requisite symptoms or behaviors" and explained that residential treatment was not covered without them. ERISA required nothing more.

38

**B.**    **Premera did not abuse its discretion in finding that the Catalyst claim did not satisfy the Plan.**

A.B.'s stay at Catalyst was not medically necessary under the Plan and the InterQual Criteria. The InterQual Criteria constitute "evidentiary standards . . . in determining whether a treatment is medically appropriate" that "are based on recommendations made by panels of experts with appropriate training and experience in the fields of medicine involved." 29 C.F.R. § 2590.712(c)(4)(iii) (example 4); *see E.W.*, 86 F.4th at 1283. The InterQual Criteria "were developed by independent companies with no financial interest" in treatment decisions; they "were written by a panel of 1,100 doctors," reference 16,000 medical sources, and are used by about 60 percent of hospitals nationwide. *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 690 (6th Cir. 2017). As this Court has explained, "[t]he InterQual criteria, promulgated by McKesson Health Solutions LLC and updated annually, 'are reviewed and validated by a national panel of clinicians and medical experts,' and represent 'a synthesis of evidence-based standards of care, current practices, and consensus from licensed specialists and/or primary care physicians.'" *Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1114–15 (9th

39

Cir. 2020); *see also Stephanie C. v. Blue Cross Blue Shield of Mass. HMO Blue, Inc.*, 852 F.3d 105, 114 (1st Cir. 2017) ("BCBS reviewers reasonably consult the InterQual Criteria, which are nationally recognized, third-party guidelines. The criteria provide a sensible structure for analyzing a patient's particular symptoms, diagnoses, risks, and circumstances to determine what level of care is medically necessary.").

Based on the InterQual Criteria, Premera reasonably denied the Members' claim on two grounds: Catalyst failed to provide the required amount of care, and A.B.'s symptoms did not justify 24/7 confinement in residential treatment for more than a year. Although the district court addressed only the first basis, this Court can reverse on either ground.

### 1. Catalyst did not provide sufficient levels of psychiatric care.

The InterQual Criteria state that residential treatment is medically necessary only when patients receive all of the following treatments:

- Psychiatric evaluation, initial within 1 business day, and subsequent at least 1 time per week;
- Psychiatric evaluation at least 1 time per week;
- Clinical assessment at least 1 time per day;
- Discharge plan initiated within 24 hours;

- Individual/family psychoeducation;
- Individual/group/family therapy at least 3 times per week; and
- Implementation of behavioral contract/symptom management plan.

4-ER-455; 4-ER-509–510. The Criteria cite standards and criteria published by recognized national professional societies, such as the American Society of Addiction Medicine, the Commission on the Accreditation of Rehabilitation Facilities, the American Psychological Association, and the American Academy of Child & Adolescent Psychiatry, for these requirements. 4-ER-429.

It is undisputed that Catalyst did not comply with these basic requirements. No psychiatrist evaluated A.B. within 24 hours of enrollment. Thus, no psychiatrist determined that residential treatment was medically necessary and effective for A.B., or developed a treatment plan for A.B.'s specific needs. Catalyst did not provide weekly psychiatric evaluations to evaluate the effect of treatment, to make any modifications to treatment, or to develop a plan for returning A.B. to his community. Catalyst did not provide daily clinical assessments. And no discharge planning occurred within 24 hours of admission. Again,

41

Catalyst's failures to comply with the InterQual requirements are undisputed.

The district court refused to address these facts, concluding that Premera "abandoned" the contention that Catalyst "did not meet the facility-specific requirements to qualify for coverage" in both the Level I and Level II appeal decisions. 1-ER-37. But this finding is not correct. The Members never filed a Level II appeal. In their Level I appeal, they never contended that Catalyst provided the services required for residential treatment facilities. 3-ER-157–170. Instead, they argued only that they were entitled to coverage because Catalyst "meets our plan's definition of a provider," that Premera had imposed "more restrictive requirements" than provided in the Plan, and that Premera was somehow estopped from applying these requirements because it covered the first 30 days of A.B.'s stay at Catalyst. *Id.*

In other words, the Members' Level I appeal never challenged Premera's determination that Catalyst failed to satisfy the requirements for coverage. For this reason, Premera was not required to re-assert that Catalyst failed to provide the requisite services. Premera had already informed the Members of the reason for the

denial. The Tenth Circuit recently confirmed that, in the administrative appeal, a Plan is not required to respond to an argument that the member did not make.[6] *E.W.*, 86 F.4th at 1296–97.

ERISA requires the plan administrator to engage in a "meaningful dialogue" with members during the appeals process. *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011). This requirement ensures that members have an opportunity to respond to the reasons for the denial. That occurred here: Premera's first denial letter articulated the rationale that the district court says it waived; the Members had every opportunity to respond during the administrative process. ERISA does not require the administrator to shadow-box ghosts by addressing arguments on appeal that the Members have not advanced. *See* 29 C.F.R. § 2560.503-1(h)(2)(iv) (requiring plan administrators to provide "a review that takes into account all

---

[6] Further, *E.W.* held that the member must preserve an argument during the administrative process in order to assert it during judicial review. *E.W.* explained that, because "during their administrative appeal, Plaintiffs failed to raise the argument they have faulted the administrator for declining to consider," the district court "properly chose not to consider that argument once Plaintiffs reached federal court." *E.W.*, 86 F.4th at 1296–97. *But cf. Vaught v. Scottsdale Healthcare Corp. Health Plan*, 546 F.3d 620 (9th Cir. 2008).

comments, documents, records, and other information *submitted by the claimant* relating to the claim." (emphasis added)).

The district court also seemed to blame Premera for the scope of the issues that the IRO psychiatrist addressed. 1-ER-36–37. But by definition the IRO psychiatrist is *independent* and certainly cannot waive a basis for denial that Premera had previously asserted.

The arguments that the Members did assert related to the facility are meritless. They contended that Catalyst satisfied the general definition of "provider" in the SPD. But to be "medically necessary," Catalyst must also satisfy the more specific Plan requirements applicable to residential treatment facilities. *See Feibusch v. Integrated Device Tech., Inc. Emp. Benefit Plan*, 463 F.3d 880, 885 (9th Cir. 2006) ("Under well-settled contract principles, specific provisions control over more general terms."); *see also Varity Corp. v. Howe*, 516 U.S. 489, 511 (1996). They challenged the use of the InterQual Criteria. But the Plan specifically authorized Premera to adopt medical policies used to further define broad standards like "medical necessity." 3-ER-393. And they contended that Premera must cover A.B.'s year-long stay because it covered the first 30 days. But no principle supports the Members'

argument that Premera was estopped from denying coverage for 12 months because it allowed the first 30 days of A.B.'s stay. The district court, which repeated this argument, cited no case supporting it. And any such estoppel rule would have perverse consequences, encouraging plan administrators to err on the side of denying coverage initially so they would not be bound to pay for much greater amounts later. *See also infra*, at 52–53.

### 2. Premera did not abuse its discretion in concluding that A.B. could have been treated at a lower level of care.

Premera denied coverage for a second reason: A.B.'s lengthy stay at Catalyst was not medically necessary because he could have been treated at a less-intensive level of care than residential treatment. To be medically necessary, the Plan requires all services be "[c]linically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury or disease" and are "not more costly than an alternative service … at least as likely to produce equivalent therapeutic or diagnostic results…." 4-ER-424. With respect to the symptoms that trigger a medical need for confinement in a 24/7 residential treatment facility, the InterQual Criteria require *both*

45

that (1) the patient cannot be "managed safely within the community"

for specified reasons and (2) the patient must exhibit specified

symptoms in the previous week. 4-ER-452–454; *see supra*, at 19–21.

Likewise, the InterQual Criteria specify the least-intensive service

required to meet patients' needs:

> There is lack of evidence to support the effectiveness of this
> level of treatment over less restrictive levels of care for
> individuals with a viable living environment, therefore *it is
> only recommended in cases where an individual cannot be
> managed safely in the community yet doesn't require the
> services of an inpatient hospitalization.*

4-ER-509 (emphasis added); *see also Julie L. v. Excellus Health Plan,

Inc.,* 447 F. Supp. 3d 38, 55 (W.D.N.Y. 2020) (holding that the InterQual

Criteria "are consistent with the Plan's basic requirement that

inpatient services are covered only where treatment in a less intensive

setting would not be effective").

Courts repeatedly enforce plans' requirements that services be the

least intensive that will meet the patient's needs. *See Krysten C. v. Blue

Shield of Cal.*, 721 F. App'x 645, 648 (9th Cir. 2018) ("The Plan states:

'If there are two or more Medically Necessary services that may be

provided for the illness, injury or medical condition, Blue Shield will

provide Benefits based on the most cost-effective service.' Given that

partial hospitalization satisfies the definition of medical necessity, the district court therefore did not err when it granted summary judgment in favor of Blue Shield."); *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1134 (10th Cir. 2011) (affirming denial of residential treatment center care because patient met criteria for continued treatment at "a less restrictive level of care" to include "several hour[s] [per] day, multiple times [per] week [of] psychiatric evaluation and treatment including counseling, education and therapeutic interventions"); *Chipman v. Cigna Behav. Health, Inc.*, 480 F. Supp. 3d 174, 183 (D.D.C. 2020) ("[T]o be medically necessary under the Plan, treatment must be rendered in the least intensive appropriate setting…. Cigna's physicians determined that Dependent's treatment could have been safely and effectively provided at a less restrictive level of care … and Cigna's reliance on that determination was reasonable.") (citations omitted), *aff'd*, No. 20-7094, 2021 WL 5537709 (D.C. Cir. Nov. 23, 2021); *Josef K. v. Cal. Physicians' Serv.*, 477 F. Supp. 3d 886, 898 n.8 (N.D. Cal. 2020) (rejecting the plaintiffs' argument that "Blue Shield's level of care guidelines fall below generally accepted standards because they treat residential treatment as appropriate only as a last

resort after all lesser levels of care have failed," because "the Plan expressly provides that 'medically necessary' services are those that are 'furnished at the most appropriate level which can be provided safely and effectively to the patient,' and '[i]f there are two or more medically necessary services that may be provided for the illness, injury or medical condition, Blue Shield will provide benefits based on the most cost-effective service'"); *Jon N. v. Blue Cross Blue Shield of Mass.*, 684 F. Supp. 2d 190, 201–02 (D. Mass. 2010) (affirming denial of residential treatment center care where plan policy was to consider "psychiatric subacute care, partial hospitalization, and intensive outpatient care" and then to authorize coverage for the "least restrictive clinically appropriate setting" when "the physician reviewers determined that Patricia's case required intensive outpatient treatment, but nothing more").

Premera did not abuse its discretion in concluding that A.B. did not meet the InterQual Criteria for long-term residential treatment. *See* 3-ER-339 (psychiatrist's report noting A.B.'s depressive disorder diagnosis, but finding absence of "severe symptoms that required 24-hour nursing supervision."); 4-ER-452–454 (InterQual Criteria). The

48

record contains no contrary evidence. The "Psychiatric Medication Evaluation" noted A.B.'s problems as anxiety disorder, depressive disorder, ADHD, and cannabis use disorder and opined that "this program will benefit him greatly." 3-ER-301. But these symptoms do not make 24/7 confinement in residential treatment medically necessary under the InterQual Criteria. *See* 4-ER-452–454. The question for the Court is "not whether [A.B.'s] course of treatment at [Catalyst] was beneficial to him but, rather, whether that course of treatment was covered under the Plan." *Stephanie C.*, 852 F.3d at 117.

The Plan provides coverage for a range of behavioral health treatments for participants such as A.B. who need care, including community-based treatments, partial hospitalization, intensive outpatient, and outpatient counseling. 3-ER-374–375; 3-ER-384; 4-ER-425. Here, a less-intensive, outpatient level of treatment was medically necessary; the Plan would have covered it. Courts have repeatedly upheld the Plan's approach of covering the least-intensive level of care. The Court should uphold Premera's decision.

Finally, that a binding IRO upheld Premera's decision is evidence that Premera's decision was reasonable. *See*, *e.g.*, *S.L. ex rel. J.L. v.*

49

*Premera Blue Cross*, 675 F. Supp. 3d 1138, 1168 (W.D. Wash. 2023) (affirming Premera's benefits determination noting "the IRO review … affirmed Premera's conclusion that residential treatment center care was not medically necessary…"); *Peter B. v. Premera Blue Cross*, No. C16-1904-JCC, 2017 WL 4843550, at *5 (W.D. Wash. Oct. 26, 2017) ("Premera's coverage determinations were consistent with Plan requirements, Premera relied on the advice of an independent physician in making its final coverage decision, there is no evidence of shifting rationales, and the IRO review validated Premera's final benefit determination.").

### 3. The district court's reasons for rejecting Premera's decision are meritless.

The district court overrode the unanimous decisions of Premera, its independent physician reviewer, and the IRO psychiatrist for two reasons: the two "letters of medical necessity" and the fact that Premera agreed to cover the first 30 days of A.B.'s stay at Catalyst. 1-ER-31–33. But these do not establish that Premera abused its discretion in denying the claim.

50

**a.** The district court first relied on a discharge evaluation by Second Nature therapist Glissmeyer and a letter submitted by A.B.'s former therapist Wood. Neither move the needle for the Members.

Wood's September 5, 2019, letter postdated A.B.'s enrollment at Catalyst by four months and was generated as an advocacy piece to support Plaintiffs' appeals months after she last treated him. 3-ER-196–197. Although her letter discusses A.B.'s past behavioral problems and treatment history, the letter does not support long-term residential treatment under the Plan's medical necessity definition. *Id.* Indeed, the letter does not even address the residential treatment criteria applied by Premera, or indicate that residential treatment was appropriate under the Plan on July 2, 2019, and for the next year.

Glissmeyer recommended "a residential or therapeutic *boarding school* setting," not 24/7 confinement in residential treatment for more than a year. 3-ER-174. And he too never addressed the requirements in the InterQual Criteria that form the basis for the medical necessity determination.

More fundamentally, as this Court recently recognized in *Williby*, the Supreme Court held that "courts have no warrant to require

51

administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." 867 F.3d at 1137–38 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003)). On the contrary, courts regularly "treat[] a nonexamining physician's review of a claimant's file as reliable medical evidence." *Gannon v. Metro. Life Ins. Co.*, 360 F.3d 211, 214 (1st Cir. 2004). And, since the abuse of discretion standard applies to Premera's decision here, this Court should defer to Premera's "choice between competing medical opinions so long as it is rationally supported by record evidence." *Black v. Long Term Disability Ins.*, 582 F.3d 738, 745 (7th Cir. 2009); *see also Autran v. Procter & Gamble Health & Long-Term Disability Benefit Plan*, 27 F.4th 405, 415 (6th Cir. 2022) ("[A]s long as administrators offer a 'reasoned explanation' for crediting independent physicians over treating physicians, we must respect their choice.").

   **b.**   The district court also attached significance to the fact that Premera covered the first 30 days of A.B.'s stay at Catalyst. The district court cited no cases holding that a plan administrator is bound by its

52

initial benefits determination, and administrators commonly provide benefits for the beginning of long-term treatment and then, upon further review, deny additional benefits. *See*, *e.g.*, *Christine S. v. Blue Cross Blue Shield of N.M.*, No. 2:18-cv-00874-JNP-DBP, 2021 WL 4805136, at *5–6 (D. Utah Oct. 14, 2021) (affirming administrator's denial of coverage after covering the first eight days of treatment); *Ariana M. v. Humana Health Plan of Tex., Inc.*, No. H-14-3206, 2018 WL 4384162, at *5 (S.D. Tex. Sept. 14, 2018) (upholding the administrator's denial after "Humana initially agreed to cover nine days of Ariana M.'s treatment, from April 14 to April 23, 2013, after finding her partial hospitalization to be medically necessary under the Mihalik criteria"), *aff'd*, 792 F. App'x 287 (5th Cir. 2019).

Simply put, the fact that Premera covered the first 30 days of treatment does not estop it from denying subsequent treatment or require it to deny treatment only based on circumstances not present during the initial 30 days.

## III. The Court should reverse the district court's attorneys' fees award.

The Court should also reverse the district court's attorneys' fees award. Under 29 U.S.C. § 1132(g)(1), "a fees claimant must show 'some

53

degree of success on the merits' before a court may award attorney's fees." *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 255 (2010). Because the Members are not entitled to any benefits, the Court should reverse the award of attorneys' fees. Nor are fees appropriate if the Members obtain the "purely procedural victor[y]." *Id.; see Simonia v. Glendale Nissan/Infiniti Disability Plan*, 608 F.3d 1118, 1120-21 (9th Cir. 2010).

## CONCLUSION

The Court should reverse the judgment and attorneys' fee award, and remand for entry of judgment for Appellants.

## REQUEST FOR ORAL ARGUMENT

Appellants request oral argument. The district court misinterpreted ERISA and misconstrued the substantial evidentiary record. Moreover, the case raises issues that arise frequently, and the district court's erroneous decision could have a deleterious impact on other cases. For these reasons, Appellants believe that oral argument will assist the Court in deciding this appeal.

Respectfully submitted,

ADAM H. CHARNES
KILPATRICK TOWNSEND &
  STOCKTON LLP
2001 Ross Avenue, Suite 4400
Dallas, TX 75201
(214) 922-7106
acharnes@ktslaw.com

*/s/  Gwendolyn C. Payton*

GWENDOLYN C. PAYTON
JOHN NEELEMAN
KILPATRICK TOWNSEND &
  STOCKTON LLP
1420 Fifth Avenue, Suite 3700
Seattle, WA 98101
(206) 467-9600
gpayton@ktslaw.com
jneeleman@ktslaw.com

*Counsel for Premera Blue Cross, Tableau Software, Inc. Employee
Benefit Plan, and Salesforce.com Health and Welfare Plan*

55

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** _____ 24-560 and 24-757 _____

I am the attorney or self-represented party.

**This brief contains** _____ **9,929** _____ **words,** including __0__ words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ X ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R.
29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
    [ ] it is a joint brief submitted by separately represented parties.
    [ ] a party or parties are filing a single brief in response to multiple briefs.
    [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** __ s/Gwendolyn Payton _____ **Date** _____ **July 3, 2024** _____
*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**        *Rev. 12/01/22*