**No. 24-560 and 24-757**

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

_____

**OKSANA B., ALEXANDER B., and A.B.,**
*Plaintiffs-Appellees,*
**v.**
**PREMERA BLUE CROSS, TABLEAU SOFTWARE, INC. EMPLOYEE
BENEFIT PLAN, and SALESFORCE.COM HEALTH
AND WELFARE PLAN**
*Defendants-Appellants.*

_____

United States District Court for the
Western District of Washington, Seattle
Honorable Marsha J. Pechman
Case No. 2:22-cv-01517-MJP

_____

**APPELLEES' ANSWERING BRIEF**

_____

Brian S. King
BRIAN S. KING, P.C.
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: 801-532-1739
Facsimile: 801-532-1936
brian@briansking.com

*Counsel for Appellees, Oksana B., Alexander B., and A.B.*

1

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 6

STATEMENT OF ISSUES .............................................................. 7

STATEMENT OF CASE ................................................................. 9

   A.   A.B.'s BACKGROUND ......................................................... 9

   B.   SECOND NATURE ............................................................ 12

   C.   CATALYST ........................................................................ 15

   D.   THE PRE-LITIGATION APPEAL PROCESS: SECOND NATURE. .... 18

   E.   THE PRE-LITIGATION APPEAL PROCESS: CATALYST. .................... 24

   F.   THE DISTRICT COURT. ................................................. 31

   G.   THE DISTRICT COURT'S OPINION AND THE PLAN TERMS......... 45

SUMMARY OF ARGUMENT ...................................................... 51

STANDARD OF REVIEW ............................................................ 55

ARGUMENT ................................................................................... 57

   A.   APPELLANTS CANNOT RELY ON ABANDONED OR POST-HOC RATIONALE TO SUPPORT THEIR DECISION TO DENY BENEFITS. ...... 57

   B.   PREMERA DID NOT MEET ITS BURDEN TO PROVE THE APPLICABILITY OF A PLAN EXCLUSION TO SECOND NATURE. ......... 60

   C.   PREMERA ABUSED ITS DISCRETION BY IGNORING THE EVIDENCE SUBMITTED TO ESTABLISH A.B.'S TREATMENT AT CATALYST WAS MEDICALLY NECESSARY. ............................................. 63

   D.   THE DISTRICT COURT PROPERLY AWARDED ATTORNEYS' FEES. 66

CONCLUSION ................................................................................ 66

REQUEST FOR ORAL ARGUMENT .................................................. 67

# TABLE OF AUTHORITIES

## Cases

29 C.F.R. 2560.503-1(g) ................................................................53, 57, 58, 60, 63

*Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955 (9th Cir. 2006) ......................56

*Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999) .........................55

*Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461 (9th Cir. 1997) ....40, 53, 54,
57, 60, 63, 65

*Boyd v. Bell*, 410 F.3d 1173 (9th Cir. 2005) ......................................................56, 62

*Chapin v. Prudential Ins. Co. of Am.*, 2021 U.S. Dist. LEXIS 52984 (W.D. Wash.
Mar. 22, 2021) .......................................................................................................33

*Charles W. v. Regence BlueCross BlueShield of Or.*, 2019 U.S. Dist. LEXIS
167184 (D. Utah 2019) ..........................................................................................33

*Collier v. Lincoln Life Assurance Co. of Boston*, 53 F.4th 1180 (9th Cir. 2022)...52,
57, 58

*Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
508 U.S. 602 (1993) ...............................................................................................56

*D.K. v. United Behavioral Health*, 67 F.4th 1224 (10th Cir. 2023).....33, 37, 52, 54,
56, 57, 58, 63

*Day v. AT&T Disability Income Plan*, 685 F.3d 848 (9th Cir. 2012) ......................56

*Dominic W. v. Northern Trust Co. Employee Welfare Benefit Plan*, 392 F. Supp. 3d
907 (N.D. Ill. 2019) ..........................................................................................54, 64

*Dowdy v. Metropolitan Life Ins. Co.*, 890 F.3d 802 (9th Cir. 2018) .......................35

*Dubaich v. Conn. Gen. Life Ins. Co.*, 2013 U.S. Dist. LEXIS 108446 (C.D. Cal.
2013)........................................................................................................................61

*Dwyer v. United Healthcare Ins. Co.*, 2024 U.S. App. LEXIS 23866 (5th Cir. 2024)....................................................................................................65

*E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265 (10th Cir. 2023)....................59, 64

*Eun Sug Cha v. 1199SEIU Health Care Emples. Pension Fund*, 672 F. App'x 714 (9th Cir. 2016) ......................................................................................55

*Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242 (2010) .......................55, 66

*Harlick v. Blue Shield of Cal.*, 686 F.3d 699 (9th Cir. 2012).....................51, 52, 58

*Ian C. v. UnitedHealthcare Ins. Co.*, 87 F.4th 1207 (10th Cir. 2023) ..40, 54, 64, 65

*K.H.B. v. United Healthcare Ins. Co.*, 2018 U.S. Dist. LEXIS 174548 (N.D. Cal. 2018)........................................................................................35, 52, 60

*LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789 (10th Cir. 2010) ...................52

*Metaxas v. Gateway Bank F.S.B.*, 2022 U.S. Dist. LEXIS 154218 (N.D. Cal. Aug. 26, 2022).................................................................................................60

*Ministeri v. Reliance Std. Life Ins. Co.*, 42 F.4th 14 (1st Cir. 2022)........................37

*N.C. v. Premera Blue Cross*, 667 F. Supp. 3d 1102 (W.D. Wash. 2023) ..............42

*Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291 (10th Cir. 2000)52, 61

*Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311 (10th Cir. 2009) ...35, 52, 60

*Robert B. v. Premera Blue Cross*, 2023 U.S. Dist. LEXIS 198144 (D. Utah 2023) ............................................................................................................40

*Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863 (9th Cir. 2008)..............................................................................................60

*Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666 (9th Cir. 2011) 33, 53, 54, 56, 63, 64, 65

*Scott v. PNC Bank Corp. & Affiliates Long Term Disability Plan*, 2011 U.S. Dist. LEXIS 69693 (D. Md. 2011) ...........................................................66

*Smith v. Hartford Life & Accident*, 2013 U.S. Dist. LEXIS 13868 (N.D. Cal. 2013)

...................................................................................................54, 64

*Wesco Ins. Co. v. Brad Ingram Constr.*, 2024 U.S. App. LEXIS 1488 (9th Cir.

2024)..................................................................................................53

*Wise v. Maximus Fed. Servs.*, 478 F. Supp. 3d 873 (N.D. Cal. 2020) ...................61

*Zall v. Std. Ins. Co.*, 2023 U.S. Dist. LEXIS 176045 (W.D. Wis. 2023) ...............66

**Statutes**

29 U.S.C. §1104(a)(1) ..........................................................................57

29 U.S.C. §1133 ...............................................................................52, 58

29 U.S.C. §1133(2) ..................................................................53, 54, 63, 65

Utah Code Annotated §26B-2-101(34) ..........................................................11, 42

**Regulations**

29 C.F.R. §2560.503-1(h) ....................................................................52, 58

# INTRODUCTION

The Employee Retirement Income Security Act of 1978 ("ERISA") requires that claims administrators such as Premera Blue Cross ("Premera") act in a fiduciary role on behalf of plan participants and beneficiaries like Oksana B., Alexander B., and A.B. (the "Family"). Premera was required fulfill its fiduciary duties by acting in the Family's best interests and engaging in a meaningful dialogue with them in their pursuit of coverage under the Tableau Software, Inc. Employee Benefit Plan (the "Plan").[1]

The District Court correctly concluded that Premera did not fulfill these duties. In litigation, Premera relied extensively on arguments and evidence it never provided to the Family in the denial letters, and faulted the Family for failure to respond to arguments it waived and improperly held in reserve. Premera engaged in an unexplained and expansive rewrite of the Plan terms to justify exclusion of A.B.'s treatment at Second Nature, even when the Family had explained that the exclusion should not apply.

Further, when the Family offered extensive evidence in the pre-litigation appeal process establishing A.B.'s ongoing treatment at Catalyst was medically necessary under the Plan, Premera ignored it. Premera cited a purported absence of

---

[1] Premera, the Plan, and the Salesforce.com Health and Welfare Plan together are Appellants.

medical evidence in support of its decision and offered no explanation for failing to credit the uncontested medical evidence that the Family did submit. And in response to the Family's argument that A.B. was receiving critical treatment for his mental health and substance use disorders, Premera offered only conclusory statements to claim A.B.'s mental health struggles did not establish medical necessity, ignoring the severity of his substance use.

The District Court rightly held that Premera and the Plan abused their discretion. Regardless of whether the Court reviews the case *de novo* or examines Appellants' conduct under the arbitrary and capricious standard, ERISA required Premera and the Plan to engage in a full and fair review of the Family's claims. Where Premera failed to communicate arguments and evidence to the Family in the pre-litigation appeal process, it cannot use that information for the first time in litigation to justify its decision. And when the only evidence properly considered by the Court was undisputed assertions and evidence offered by the Family in support of coverage, Premera's conclusory and unsubstantiated denial letters lead to only one conclusion: a firm and definite conviction that Premera improperly denied the Family's claims. This Court should affirm.

## STATEMENT OF ISSUES

1. ERISA's full and fair review requirements mandate that claimants have an opportunity to respond to the reasons used to deny their claims. In the Court

below and in their opening brief, Appellants rely extensively on arguments and evidence that do not appear in the denial letters the Family received. Is it improper for Appellants to offer new arguments and evidence in litigation?

2. It is a well-accepted principle of insurance law that administrators relying on an exclusion must prove the applicability of that exclusion. The Family presented evidence to establish that Second Nature was not merely a recreational "wilderness program." Premera did not explain why Second Nature was a "wilderness program," and did not explain why it read the exclusion to include any mental health care occurring outdoors. Did Premera meet its burden to establish the exclusion applied?

3. ERISA administrators must engage in a meaningful dialogue with claimants and cannot arbitrarily refuse to credit evidence they offer in support of a claim. The Family argued that Premera's prior approval, the recommendations of A.B.'s treating providers, and medical records showing A.B.'s ongoing mental health and substance use struggles together established the medical necessity of A.B.'s treatment. Was it an abuse of discretion for Premera to ignore the Family's evidence and arguments?

4. ERISA Plaintiffs who obtain some success on the merits may be awarded attorneys' fees in the discretion of the District Court. Does a ruling giving

the Family the right to an ERISA-compliant remand support an award of fees?

## STATEMENT OF CASE

### A. A.B.'s BACKGROUND.

The Family are participants and beneficiaries of the Plan, a self-funded employee welfare benefits plan governed by ERISA, 29 U.S.C. §1001, *et. seq.* Br. Aplt. 4–5. Premera was the third-party claims administrator and fiduciary under ERISA for the Plan. *Id*; 2-ER-108; 3-ER-342.

Oksana B. and Alexander B.'s son, A.B., was plagued by alcohol and substance abuse issues, as well as depression, parent-child relationship problems, and an oppositional defiant disorder. See 1-ER-17; 3-ER-163–168; 3-ER-172. But this was not always the case. As a young child, A.B. became fluent in English (in addition to his native Russian) in just over four months, competed in slopestyle terrain park skiing at the national level, and was academically successful beyond his years through at least sixth grade. 3-ER-163–164. But in November of 2016, when A.B. was just twelve, he was suspended for bringing a knife to school he purchased online using money and a secret account his parents had no idea of. 3-ER-164. Less than four weeks later, he was expelled for being in possession of drug paraphernalia with the intent to distribute. *Id*.

This marked the beginning of A.B.'s struggles. He returned to school after completing a substance use assessment and was suspended the next day for disruptive conduct and lying to his teachers. *Id*. Throughout the beginning of 2017, he oscillated between outpatient intervention programs and returns to school and was suspended seven times during his seventh grade year alone. *Id*. Staff at his school informed the Family that he was often seen with older alumni and various kinds of drug paraphernalia, and A.B. received his final warning, an indication that any further infractions would result in his permanent expulsion. *Id*. At this point, the Family sought the help of a child psychologist, Jovana Radovic Wood, LMFT, who first diagnosed A.B. with ADHD and treated him throughout 2017 and 2018. 3-ER-164–165.

A.B. was suspended once more in June of 2018, and he was found to be stealing money and credit cards from his parents, which he used to ship and resell drug paraphernalia. 3-ER-165. A.B. entered high school in the middle of 2018 and his drug use only increased. *Id*. He began dealing pills, mushrooms, and other drugs in addition to marijuana. *Id*. In addition, September 28th of 2018 was A.B.'s first visit to an emergency room for suicidal ideation. *Id*.

A.B. began to distance himself from the rest of his family and became irritable and aggressive around them. *Id*. In addition to becoming more brazen (and getting caught) in drug use, A.B. developed a serious drinking problem. *Id*. A.B.

10

drank as many as ten shots per day, four or five days per week in the summer of 2018, and twice a week during the school year. 3-ER-288. In December of 2018, A.B. documented his consumption of one hundred beers alongside some wine over the course of a few days in Mexico. 3-ER-165–166. A.B. drank and smoked daily in January of 2019, became openly belligerent, and was caught stealing pills from a local drug store to resell at his school. 3-ER-166. A.B. was caught preparing marijuana for distribution, admitted to trying hard drugs such as acid and mushrooms and to a desire to try cocaine, and was later determined to have tried other designer drugs. *Id*; 3-ER-288. The Family found syringes in his room, but they did not know if he had tried shooting up or not. *Id*.

The Family consulted his therapist, and she recommended inpatient treatment at Second Nature for his own safety. *Id*; 1-ER-17. During A.B.'s treatment, Second Nature was licensed as an Outdoor Youth Treatment Center in Utah. 3-ER-333. Under Utah state law these programs provide services to children with chemical dependencies, behavioral dysfunctions or impairments, occur in a "24-hour" setting, and provide regular therapy. See Utah Code Annotated §26B-2-101(34). More broadly, "Youth program[s]" in Utah do "not include recreational programs." *Id*, at (51)(b). A.B. was taken by crisis interventionists to be admitted to Second Nature on February 6, 2019, and received treatment there until June 3, 2019. 3-ER-172.

11

**B. SECOND NATURE**

Shortly after A.B.'s admission to Second Nature, Devan Glissmeyer, Ph.D., a psychologist, prepared a master treatment plan for A.B. and listed numerous diagnostic impressions of A.B. 3-ER-175. These included oppositional defiant disorder, major depressive disorder, parent-child relational problems, ADHD, cannabis use disorder, and alcohol use disorder. 3-ER-175; 1-ER-18. Glissmeyer outlined a treatment plan and listed some of the problems A.B. was facing in addition to his likely diagnoses. See 3-ER-176–181. This treatment plan documented A.B.'s "manipulative" and "out-of-control or violent behavior directed at self and others," noted long-term goals to decrease his depression and improve his relationship with his family, and noted his "poor impulse control" and cannabis abuse. *Id*.

Glissmeyer met with A.B. weekly for hour-long therapy sessions. See 3-ER-182–195. On February 12, 2019, Glissmeyer noted that A.B. was frustrated, entitled, and lazy, and had used alcohol three to four times per week as well as acid, marijuana, and mushrooms. 3-ER-182. He noted A.B.'s thoughts of suicide and that he was "devoid of ownership [or] accountability" for his actions. *Id*. On February 20, 2019, Glissmeyer noted A.B. was "tearful" and that he spent "more time hating [his peers] than liking them." 3-ER-183. On February 28, 2019, Glissmeyer noted that A.B. "remains opposed to progress." 3-ER-184. On March

6, 2019, A.B. continued his "pushback," was "at times angry," and was noted to refuse to acknowledge empathy and to lack sympathy for others. 3-ER-185. On March 14, 2019, A.B. was noted to have been "removed" from his group for inappropriate "interpersonal interactions," and continued to be "short-tempered" and refuse feedback. 3-ER-186. On March 19, 2019, A.B. made some of his first strides in treatment, finally being willing to "talk about [his] temptation" to use drugs – but also disclosed that he had managed to sneak drug paraphernalia into treatment somehow, although it had been taken by his peers. 3-ER-187.

A.B. see-sawed between superficial improvement and meaningful setbacks throughout his treatment. On March 26, 2019, he seemed to improve, but he was "generally sad, withdrawn, [and] frustrated" on April 9, and Glissmeyer noted that A.B. risked "habituating internaliz[ed] resentment" of his parents. See 3-ER-188– 189. On April 16, A.B. remained sad and frustrated, and withdrew immediately in his therapy session with Glissmeyer, continuing to blame others for his own actions and substance use. See 3-ER-190. A.B. remained oppositional, generally reluctant to engage in treatment, and angry throughout his treatment at Second Nature, even if he did make some progress. See generally 3-ER-182–195; 3-ER-172–174.

At the end of A.B.'s treatment at Second Nature, Glissmeyer provided a discharge summary as well as recommendations for further treatment. 3-ER-172–

13

174; 1-ER-18–19. A.B. "remained resistant throughout his stay," and "remained resigned to blaming his parents and maintained an overall below average level of engagement and success in the program." 3-ER-173. A.B. was not open to processing his emotions and "struggled often with simple requests." 3-ER-172. He continued to "minimize issues and display poor frustration tolerance." *Id*. A.B. "express[ed] a desire to remain abstinent from drugs," but he "continue[d] to struggle with the motivation to do so." 3-ER-173. Accordingly, Glissmeyer noted A.B. was "at increased risk for relapse without continued intervention and support in this area." *Id*. And Glissmeyer also noted that A.B. "showed variable mood and continued depressive periods" throughout his treatment at Second Nature. 3-ER-174.

In his closing remarks and recommendations, Glissmeyer noted "significant concern regarding [A.B.'s] risk for relapsing in the areas of opposition, anger, depressive symptoms, and substance abuse if he were to return to his home environment after completing our program… [i]f any long-term gains are to be made, he must be in a residential [setting] or therapeutic boarding school setting after Second Nature[.]" 3-ER-174. Glissmeyer explained that, for A.B., a return to "his home environment, even with intensive outpatient therapy or school accommodation, would almost certainly result in significant regression and a return

to his previous level of functioning." *Id*. A.B. was discharged from Second Nature and transitioned to Catalyst on June 3, 2019. 3-ER-174.

### C. CATALYST.

A.B. received mental health and substance use treatment at Catalyst from June 3, 2019, until July of 2020. Br. Aplt. 10. Premera approved A.B.'s stay at Catalyst for thirty days, finding treatment medically necessary through July 2, 2019. 1-ER-19; 3-ER-162. On June 4, 2019, A.B. was evaluated by Karen Miller, a registered nurse. 3-ER-287–297; 1-ER-19. Miller noted that A.B. had last used drugs and alcohol in February of 2019, immediately before his admission to Second Nature, and that he had used substantially and daily before his admission. 3-ER-288. In addition, Miller noted that A.B. continued to have drug and alcohol cravings upon his admission to Catalyst, and that he was plagued by nightmares and dreams about drugs. 3-ER-289; 3-ER-294; 1-ER-19–20. Miller recorded that A.B.'s continuing care needs included "[p]sychiatric [f]ollow-up," "[i]ntensive [c]ase [m]anagement," "[p]sychological [f]ollow-up," and "[o]ngoing [m]edication [m]anagement," and explicitly indicated that he should *not* return home. 3-ER-296–297.

A week into his treatment at Catalyst, A.B. underwent a psychiatric medication evaluation with Meghan Kunz, PMHNP, a psychiatric mental health nurse practitioner. 3-ER-298–301. Kunz noted A.B.'s history of pervasive drug use

and drug dealing, isolation, and family conflict. 3-ER-298; 3-ER-300. Kunz also acknowledged that A.B. had begun experiencing "suicidal ideation at the age of 8 or 9," that in the past he had "made a plan," but that he had never made an attempt on his own life and did not have any suicidal or self-harm ideation at the time. 3-ER-298–299. She noted A.B.'s ongoing depression, self-doubt and anxiety. 3-ER-299. Kunz diagnosed A.B. with anxiety disorder, depressive disorder, ADHD, and cannabis use disorder. 3-ER-301; 1-ER-20. She also "highly recommend[ed]" Catalyst's treatment program for A.B., indicating that the "individual, family, group and recreational therapy" and "[a]cademic and [s]ubstance use treatment" offered in the facility "will benefit [A.B.] greatly." 3-ER-301.

While at Catalyst, A.B. received regular therapy and made limited progress. 1-ER-20; 3-ER-198–249; 2-SER-161–381; 3-ER-250–286. On the 30th day of his treatment at Catalyst, A.B.'s provider noted he had an emotional breakdown in one of his therapy sessions and was "not doing a lot of anything at Catalyst right now." 2-SER-367. There was no indication that his symptoms had improved to the point that he no longer needed residential treatment, and the master treatment plan developed on July 8, 2019 – five days after Appellants determined care was no longer necessary – listed *five* DSM-5 diagnoses: major depressive disorder, oppositional defiant disorder, cannabis use disorder, alcohol use disorder, and a

parent-child relational problem – adding alcohol use disorder to the previous diagnoses from Nurse Kunz. 2-SER-346; 1-ER-20.

One of A.B.'s therapists, Blake Altom, LMFT, listed out the observations and evidence supporting each of these diagnoses in the master treatment plan. 2-SER-346–354. A.B.'s major depressive disorder was evidenced by "[d]epressed mood most of the day, nearly every day, as indicated by… [feeling] sad, empty, [or] hopeless," and other's observations that A.B. "appear[ed] tearful." 2-SER-348. A.B. also showed "[m]arkedly diminished interest or pleasure in all, or almost all, activities" nearly every day, suffered from "[i]nsomnia or hypersomnia nearly every day," constant fatigue, and a consistently diminished "ability to think or concentrate." *Id*.

A.B.'s oppositional defiant disorder was supported by observations that he was "often angry and resentful," would argue with authority figures and adults, "actively def[ied] or refuse[d] to comply with" instructions or rules, continued to blame others for his mistakes or misbehavior, and that he was spiteful or vindictive. 2-SER-349. In support of the cannabis use disorder diagnosis, Altom noted that A.B. often took cannabis in larger amounts than he intended, was "unsuccessful" in any attempt to cut down or control his cannabis use, and spent a "great deal of time" attempting to obtain, use, or recover from cannabis use. 2-SER-350. Additionally, Altom noted that A.B.'s constant craving and excessive

17

use negatively impacted almost every aspect of his life, and that even though A.B. knew his use had such grave negative impacts, A.B. continued to desire to use. *Id*.

The same was largely true of Altom's impressions supporting the alcohol use disorder diagnosis: A.B. often consumed more alcohol than intended, craved it and had urges to drink, and continued to drink excessively despite being aware of the outsize negative effects on his life. 2-SER-352. Additionally, Altom noted that A.B. needed "markedly increased amounts of alcohol to achieve intoxication or desired effect." *Id*. And Altom also noted that A.B.'s parent-child relational problem was evidenced by continued in-fighting with his parents, the impressions of A.B., his family, and the "previous mental health professionals" who had treated A.B. 2-SER-354.

A.B. remained at Catalyst until his discharge in late July of 2020, and he underwent treatment again at Second Nature until October 16, 2020. 2-ER-114; Br. Aplt. 10. Appellants found A.B.'s care at Second Nature during that period medically necessary, although Appellants are correct to note that period is not at issue in this litigation. 2-ER-114; Br. Aplt. 10.

## D. THE PRE-LITIGATION APPEAL PROCESS: SECOND NATURE.

In a letter dated October 25, 2019, Premera denied payment for A.B.'s treatment at Second Nature, providing a list of claims and then simply stating that "this service is not covered under your plan." 3-ER-332. The Family submitted a

level one appeal of this denial on December 20, 2019. See 3-ER-325–331. They reminded Premera of its obligations under ERISA and asserted that A.B.'s treatment at Second Nature was a "covered benefit under our plan." 3-ER-325–327. From the get-go, the Family referred to Second Nature as an "Outdoor Behavioral Health" facility. 3-ER-325. They directed Premera to contact Dr. Michael Gass, a preeminent expert on the efficacy of intermediate outdoor behavioral healthcare, if Premera had any qualms about A.B.'s treatment at Second Nature. 3-ER-327.

To establish coverage under the Plan, the Family said they were unable to find "any exclusion for intermediate behavioral health treatment," and asserted that covered services could be rendered by "[a]ny other provider listed under the definition of 'provider' [as articulated by the 'Definitions' section of the summary plan description] who is licensed or certified by the state in which the care is provided, and who is providing care within the scope of his or her license." 3-ER-328. The Plan's definition of a "Provider" was any "health care practitioner or facility that is in a licensed or certified provider category regulated by the state in which the practitioner or facility provides care, and that practices within the scope of such licensure or certification… [a]lso included is an employee or agent of such practitioner or facility, acting in the course of and within the scope of his or her

19

employment." *Id*. The Plan says that mental health services can be furnished by any such provider. 3-ER-374–375.

The Family clarified that Second Nature met this provider definition, as it was licensed as an intermediate behavioral health treatment program for treatment of children and adolescents and operated within the scope of its license. 3-ER-328; 3-ER-333; 1-ER-21. Because no exclusion or plan term was identified that was relevant to Second Nature's actual licensure (and no plan term was identified *at all* in the initial denial), the Family asked Premera for the basis of its judgment and asserted that Second Nature clearly provided covered services. 3-ER-328.

They also noted their concerns that Premera could be violating the Mental Health Parity and Addiction Equity Act by imposing discriminatory treatment limitations based on facility type, but those claims are not the subject of this appeal. 3-ER-328–330. However, they did note that Premera had a limitation exclusive to mental health benefits stating that it excluded "outward bound, wilderness, camping or tall ship programs or activities" from coverage, and that that exclusion was inapplicable to Second Nature. 3-ER-330–331.

Premera denied this appeal on February 20, 2020. 3-ER-321. In doing so, Premera asserted that Second Nature was a "wilderness program" and denied coverage. *Id*. Premera indicated that it "does not cover wilderness programs, regardless of the nature of the facility associated with the wilderness program." *Id*.

But Premera also indicated that "it does allow coverage for medically necessary treatments, such as mental health counseling, from an eligible, licensed provider that may have been provided during the stay at Second Nature," and encouraged the Family to submit claims for these services. *Id*. Premera reviewed "[m]edical records," the plan document, 2019 InterQual Guidelines for Child and Adolescent Psychiatry, an internal utilization management guideline about psychiatric evaluations, and a "specialty review report" when considering the appeal. *Id*.

Notably, the denial does not indicate that Premera reviewed the appeal letter at all. *Id*. Despite the Family making it clear that Second Nature was an "eligible, licensed provider," Premera still denied the claim and encouraged them to seek coverage the same way they already had – for "medically necessary treatments… from an eligible, licensed provider." *Id*. Premera attached the opinion of an external reviewer to its denial who came to the same conclusion. 3-ER-323; 1-ER-22. Premera's denial did not cite to any term of the Plan, only stating in a conclusory fashion that it excluded wilderness programs. 3-ER-321.

The parents submitted a second appeal on March 21, 2020. 3-ER-302–320. They maintained that the denial was issued in error, and noted that Premera stated it had reviewed "medical records" that were never sent, because the medical necessity of A.B.'s treatment at Second Nature "was never in question." 3-ER-306. The Family noted that Premera had not justified its decision and had not disputed

21

the fact that Second Nature provided medically necessary treatment. 3-ER-306–308. They also pointed to Premera's denial letter, which attempted to justify its application of the exclusion by saying it could not determine "whether the service is generally accepted in the medical community [as effective], the availability of research [demonstrating its] medical efficacy, the existence and pervasiveness of state licensing standards for providers of the service, and whether there are generally accepted medical standards for evaluating medical necessity." 3-ER-308. The Family had already established that there was plenty of evidence supporting the efficacy of outdoor behavioral health programs like Second Nature, and had directed Premera to reach out to Dr. Michael Gass if it had any concerns, but Premera did not do so. 3-ER-308–310.

The Family once again explained how the treatment provided by Second Nature was medically necessary, established the efficacy of outdoor behavioral health programs, demonstrated that state licensing standards for this kind of treatment were pervasive, and pointed to generally accepted medical standards for evaluating medical necessity of outdoor behavioral healthcare. 3-ER-312–314. They attached a sizeable packet of peer-reviewed literature establishing each of

these points to the appeal. See 3-ER-312 (citing to "Exhibit 6: *Peer-Reviewed Literature*, Intermediate Outdoor Behavioral Health, Various, 733 pages").[2]

The Family again refuted Premera's improper construction of the exclusion. They noted that "our plan's general 'Exclusions' section does not include any mention of intermediate behavioral health programs or outdoor behavioral health programs." 3-ER-316. Instead, they noted that the plan's mental health benefits section stated "[o]utward bound, wilderness, camping or tall ship programs or activities" were excluded. *Id*. The Family noted that Premera's offered alternative – to pay for all of the component services at Second Nature "with the exception of his room and board" – was unacceptable to them. 3-ER-318. Premera's offer to pay for the clinical components of the treatment at Second Nature refuted the justification of Premera's initial denial – that the services were excluded because they were somehow not shown to be effective – when Premera itself acknowledged the opposite in offering to pay for A.B.'s treatment in piecemeal fashion. 3-ER-308; 3-ER-321.

Premera issued another denial in response on July 17, 2020. 4-ER-534. Premera stated "[y]our request for coverage of the wilderness therapy remains

[2] The Family do not include this information in the record on appeal because it would inordinately increase its size, and they only cite to it generally. They note that Appellants cannot dispute its existence or whether they received this information, as it is contained in the record before the district court produced by Premera at OKS_PRE0001118 through OKS_PRE0001851.

denied… [t]his decision was made based on the contract language which specifically includes wilderness therapy." *Id*. Premera asserted, without support, that Second Nature was "licensed as a wilderness treatment program in the state of Utah" and that the plan "clearly states that this type of facility is not covered under the plan." *Id*. In addition, for the first time and after the Family had already exhausted their appeal rights under the Plan, Premera argued A.B. did not display symptoms warranting "treatment at a licensed Residential Treatment Center," citing to InterQual and an internal medical policy. *Id*. The Family decided not to pursue an optional external review and brought suit. 2-ER-107.

### E. THE PRE-LITIGATION APPEAL PROCESS: CATALYST.

On July 5, 2019, after covering the first thirty days of A.B.'s stay at Catalyst, Premera denied any continuing care after July 2, 2019 for lack of medical necessity. See 4-ER-531–532. Premera indicated it reviewed its internal policies, the InterQual guidelines, unspecified and uncited "medical records" from Catalyst, and the Plan in its decision to deny coverage. 4-ER-532. Premera stated that A.B. "had either not shown certain signs of distress or that his symptoms improved." 1-ER-23; 3-ER-531–532. The denial did not specify *which* symptoms were specifically absent, nor did it cite to A.B.'s medical records in any way. *Id*. Additionally, Premera argued that the "treatment guidelines" it used asked for facilities to provide weekly psychiatric evaluations, daily clinical assessments by

24

licensed providers, discharge planning, and individual, group, or family therapy at least 3 times per week. 3-ER-532; 1-ER-23.

The Family submitted an appeal on December 20, 2019. 3-ER-157–170. After reminding Premera of its obligations under ERISA, they refuted "Premera's allegation that the intensity of clinical services provided by Catalyst do not meet our plan's requirements for coverage." 3-ER-158–161. The Family explained that Premera's denial letter referenced an internal medical policy, and that the very medical policy referenced stated that the terms and conditions of the Plan would prevail. See 3-ER-161.

The Family noted that mental health benefits may be rendered by any provider who was "licensed or certified by the state in which the care is provided" and that provides treatment "within the scope of his or her license." 3-ER-161. They established that Catalyst met the Plan's definition of a provider, as it was duly licensed by the state of Utah as a residential treatment center for children and adolescents and operated within the scope of that license. 3-ER-161; 3-ER-171. The parents argued that "[g]iven that our plan only requires that services be rendered by duly licensed providers, Premera cannot use a[] supplementary protocol to impose any additional requirements… [t]o do so would [] allow arbitrary internal policies to supersede the terms and conditions of our plan." 3-ER-161.

They also reminded Premera that it had already found A.B.'s treatment medically necessary under the Plan and had authorized his first thirty days of treatment. *Id*. They noted that "[h]aving once acknowledged that Catalyst met all of our plan's requirements for coverage, how can you justify imposing more restrictive requirements spontaneously?" *Id*. The parents expressed concern that Premera had arbitrarily and capriciously denied coverage while "unreasonably disregarding the treating providers' opinions based solely on a file review, failing to account for the patient's history of failed treatment in lower levels of care, and cherry-picking the medical evidence to best support a predetermined conclusion." 3-ER-162. They also noted that it "appear[ed] that Premera has introduced more restrictive requirements for [coverage of] non-authorized days than were imposed on authorized days… by authorizing exactly thirty days of residential treatment, it is even more obvious that Premera's decision to deny benefits was based on preconceived notions about the maximum length of stay rather than [A.B.]'s specific needs." *Id*.

Having expressed their concerns about Premera's treatment of their claims, the Family asked that Premera evaluate the medical necessity of A.B.'s treatment using the Plan's definition of medical necessity. 3-ER-162–163. They provided a detailed description of A.B.'s medical and prior treatment history, as well as evidence to support the medical necessity of his treatment, including A.B.'s

medical records from both Second Nature and Catalyst. 3-ER-163–169. In doing so, the Family submitted a letter of medical necessity from A.B.'s therapist Jovana Radovic Wood, LMFT, and quoted from Devan Glissmeyer, Ph.D.'s discharge summary from Second Nature. 3-ER-166–168.

Wood indicated that "[g]iven the persistence of [A.B.'s] symptoms over the years, [and] despite continued engagement in behavioral, medication, and most recently, residential therapy, a continued more intense level of treatment [is] necessary." 3-ER-168; 3-ER-197–197. Glissmeyer's discharge summary established that without the level of care provided at Catalyst, "there remains significant concern regarding [A.B.'s] risk for relapsing." 3-ER-174. The Family noted that "all of [his] treating professionals agreed that long-term treatment in a subacute residential level of care is necessary and appropriate." 3-ER-168; 1-ER-24. They then asked Premera "[o]n what basis" it disagreed with the diagnoses and recommendations of A.B.'s providers, reiterated that A.B. had received treatment and interventions at lower levels of care that were ineffective, and concluded their appeal. 3-ER-169.

In response, Premera upheld its denial on January 14, 2020, although it did not deliver this denial letter to the Family until January 30, 2020. 3-ER-334; 3-ER-147. It indicated that A.B.'s care was "not medically necessary," and stated, in conclusory fashion, that A.B. was "not wanting to harm [him]self or others," was

not "hearing or seeing things that were not there," was not so disturbed that he required 24-hour nursing supervision, and that A.B. "continued to make progress" in his treatment. 3-ER-334. Accordingly, Premera recommended A.B. receive outpatient, partial hospitalization care. *Id.*

Once again, Premera's denial did not cite to any of A.B.'s medical records or provide any basis to support its conclusions. *Id.* And again, Premera indicated it reviewed "[m]edical [r]ecords," the summary plan description, its internal medical policy, InterQual, and a "specialty review report" – neglecting to state that it had reviewed the appeal letter or attached exhibits at all. *Id.*

Premera also sent the opinion of an external reviewer alongside this denial that cited sparingly to just six treatment notes from throughout A.B.'s five months of treatment to that point. 3-ER-337–338. This external reviewer indicated A.B.'s care was not medically necessary for the same reasons Premera did. 3-ER-338. Neither Premera's denial nor the external reviewer's report made any mention of A.B.'s substance use treatment. See 3-ER-334–335; 3-ER-337–338. In fact, although A.B. had been diagnosed with both alcohol use disorder and cannabis use disorder, the external reviewer only said A.B. was diagnosed with "major depressive disorder." 3-ER-337. And neither Premera nor the external reviewer addressed, refuted, or questioned the credibility of the medical necessity evidence submitted by the Family, including the recommendations of residential treatment

from A.B.'s treating providers. See 3-ER-334–335; 3-ER-337–338. Premera supposedly sent a request for any additional information that the Family might want to submit in support of their appeal, but it was never received by the Family and Premera could not confirm it was sent. 3-ER-146–147. Because of Premera's failure to send this denial letter and any follow-up communication in a timely manner, Premera argued that its "timeframe to review the appeal has expired," and that the Family could request an external review. 3-ER-147.

Because their Plan allowed for two levels of internal appeal, and citing the confusion presented by Premera's letter seeming to inform them they had already exhausted the Plan's internal review procedures, the Family submitted an "Independent Review Organization Request Or Level Two Member Appeal" on February 26, 2020. 3-ER-144–156. In doing so, the Family noted that "to [their] knowledge, it appears that Premera has decided to uphold the medical necessity denial but overturn the intensity of service denial, as this issue was not raised in Premera's response to our level one appeal." 3-ER-145. The Family once again requested that whoever reviewed the appeal "not utilize" the InterQual criteria, which they asserted violated generally accepted standards of medical practice. 3-ER-148. They argued that the symptoms Premera looked for under InterQual were improperly acute, even though facilities like Catalyst provided subacute treatment. 3-ER-150. Particularly because A.B. was also receiving treatment for his substance

29

use disorders, for Premera to evaluate the medical necessity of A.B.'s treatment without considering his substance use disorders and symptoms at all was an abuse of discretion. 3-ER-150–151.

To point out the inaccuracy of the statements of the external reviewer, the Family pointed to the reviewer's interpretation of A.B.'s status and symptoms on August 19, 2019. 3-ER-151–153. The external reviewer had acknowledged that A.B. was "stuck in his therapy," did not want to change, and did not think he needed to. 3-ER-152. But despite acknowledging that A.B. was sad and guarded, the reviewer concluded that A.B. was "discussing the barriers he was putting up" that got in the way of therapy, that his mood, affect, and thought content were "appropriate," that he was concentrated and focused, and that his speech was normal. 3-ER-152.

In contrast, the Family quoted to A.B.'s individual and family therapy progress notes from that same day. 3-ER-152–153. Unlike the external reviewer, those notes suggested that A.B. also continued to be anxious, depressed, angry, and suffering from cognitive distortion. 3-ER-152–153. Additionally, the progress notes stated that "[t]he communication between parents and [A.B.] is basically nonexistent… [t]here is a long way to go." 3-ER-153. The Family reminded Premera that one of the reasons A.B. needed residential treatment was how aggressive and violent he would often become at home, and maintained that

30

Premera violated generally accepted standards of medical practice. 3-ER-153.

They attached a complete copy of A.B.'s medical records at Catalyst from June 3,

2019, through February 20, 2020, to this appeal, as well as a copy of their previous

appeal alongside the letters of medical necessity. See 3-ER-145; see also 3-ER-

154; 3-ER-196–249; 2-SER-161–381; 3-ER-250–286.

Premera treated this appeal as an external review request and submitted it to

MET Healthcare Solutions. 4-ER-525. The external reviewer concluded that A.B.'s

lack of acute symptoms meant that his needs could have been managed in an

intensive outpatient program. 4-ER-528–529. The reviewer also noted that "the

claimant appears to have a history of alcohol and substance abuse, parent-child

issues, and depression requiring admission at Catalyst [] on 06/03/2019." 4-ER-

528. The reviewer claimed there was "no documentation" to demonstrate A.B.

experiencing disorganized behavioral problems, homicidal or suicidal ideation,

hallucinations, psychotic behavior, or intent to harm himself or others. 4-ER-528.

The reviewer, much like Premera, failed to respond to, dispute, or provide any

reason for ignoring the letters of medical necessity from Wood or Glissmeyer. 4-

ER-527–528. Having exhausted their rights, the Family sued. 2-ER-107.

## F. THE DISTRICT COURT.

The parties proceeded to brief cross-motions for judgment. 1-ER-26; 2-ER-

74–106; 1-SER-84–110. The Family articulated facts in their motion describing the

prelitigation appeal process, the evidence submitted by them to support their claims for coverage, and Premera's deficient responses. 2-ER-75–92. They argued that the services were medically necessary if a physician exercising prudent clinical judgment would provide the service for the purpose of preventing, evaluating, diagnosing or treating any illness, disease, or its symptoms. 2-ER-94. They noted that all of A.B.'s treating providers agreed A.B. required residential treatment, and that these recommendations were prudent because without such a level of care A.B. could not be treated safely or effectively. See 2-ER-94-96. The Family noted that A.B.'s diagnoses of ADHD, major depressive disorder, oppositional defiant disorder, alcohol use disorder, cannabis use disorder, and a parent-child relational problem together with the persistence of his symptoms made longer-term treatment in a supervised, inpatient treatment setting necessary. 2-ER-95–96. And in contrast, Premera's denial rationale assumed without reference to A.B.'s medical or treatment history and without reference to his risk of relapse that he was ready to be treated at a lower level of care. 2-ER-96.

The Family noted that Premera failed to respond to or refute the letters of medical necessity they provided, and that Premera had simply made conclusory denial statements entitled to less weight than the opinions of those who actually treated A.B. 2-ER-96–97. They noted that Premera's failure denied them their right to full and fair review under ERISA, and that "[w]holesale rejection" of letters of

medical necessity cannot be reasoned when citing to an absence of evidence because Premera had to cite to contradictory evidence to refute those opinions. 2-ER-97; *see Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *and D.K. v. United Behavioral Health*, 67 F.4th 1224, 1241-43 (10th Cir. 2023); *Chapin v. Prudential Ins. Co. of Am.*, 2021 U.S. Dist. LEXIS 52984, *27-29 (W.D. Wash. Mar. 22, 2021).

The Family argued that Premera arbitrarily denied coverage after one month of treatment at Catalyst without citing any notable change in A.B.'s diagnosed conditions or his symptoms between admission and the date Premera denied coverage. 2-ER-97. Because Premera's denial did not actually reference A.B.'s medical records at all, they argued that the denial was based on "preconceived notions" about the appropriate length of residential treatment, "rather than [] a case-specific assessment of [the patient's] needs," which was "inappropriate." 2-ER-98; *see Charles W. v. Regence BlueCross BlueShield of Or.*, 2019 U.S. Dist. LEXIS 167184, *31-32 (D. Utah 2019). Accordingly, Premera could not "claim it denied treatment because of a lack of medical necessity when it had already approved it under the exact same conditions, only to contradict itself as soon as it became convenient to do so." 2-ER-98.

The Family noted the same lack of attention to A.B.'s medical records in Premera's denial of coverage for Second Nature, which "did not explain *how* A.B.

and his treatment [might have] failed to" meet their proprietary criteria which were superseded by the terms of the Plan which did not incorporate them by name. 2-ER-99. They also made arguments about the propriety of Premera's symptom requirements and purported exclusion for wilderness programs in support of their MHPAEA cause of action, which is not at issue in this appeal. 2-ER-100–105.

Appellants filed their own motion for summary judgment. 1-SER-84–110. In their Motion for Summary Judgment, Appellants referred to improper extra-record evidence submitted by their counsel containing screenshots of the websites for Second Nature and Catalyst from June of 2023, several years after both the treatment at issue and Premera's review of the claims. 1-SER-85; 2-ER-40–73. Appellants made factual findings and attempted to address evidence that they had not discussed in any of their pre-litigation denials, a fact the Family pointed out in their briefing. See 1-SER-85–94; see also generally 1-SER-38–45.

Appellants argued for the first time that the exclusion they relied on to deny coverage at Second Nature was based on Plan language stating that "recreational, camp and activity based programs" were not covered, and that this clarified the exclusion of "[o]utward bound, wilderness, camping or tall ship programs or activities." 1-SER-96–97. Appellants continually referenced Second Nature's licensure and the Family's assertion that Second Nature was a "licensed clinical provider and outdoor youth program" to assert that "[the Family] concede that

34

Second Nature is a wilderness program." 1-SER-24; 1-SER-60. Appellants quoted cases showing that Second Nature *was not* a residential treatment center in a misguided attempt to establish that it *was* a "wilderness program." 1-SER-97. Appellants never acknowledged that it was their burden to establish the applicability of an exclusion under the Plan. See generally 1-SER-22–36; also 1-SER-58–110; *see also K.H.B. v. United Healthcare Ins. Co.*, 2018 U.S. Dist. LEXIS 174548, *10-11 (N.D. Cal. 2018) ("[T]he insurer has the burden of showing that a loss falls within an exclusionary clause of the policy.") (quoting *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1319 (10th Cir. 2009)); *see Dowdy v. Metropolitan Life Ins. Co.*, 890 F.3d 802, 810 (9th Cir. 2018). Instead, they argued without support that the Family had not met their burden to establish coverage even if the care was "medically necessary." 1-SER-60.

Appellants argued that Premera decided to deny coverage of A.B.'s treatment at Catalyst because it "did not provide adequate psychiatric evaluations" and because A.B.'s condition "could have been effectively treated at a lower level of care." 1-SER-97. Appellants pointed to the InterQual criteria to make these arguments, asserting that no psychiatrist evaluated A.B. at enrollment, Catalyst did not provide weekly psychiatric evaluations, and that the psychiatric medication evaluation from a week after A.B.'s admission "did not document any psychiatric

symptoms establishing A.B.'s stay at Catalyst was medically necessary." 1-SER-98. Appellants offered no explanation for their ignorance of A.B.'s substance use issues and Catalyst's treatment of those issues. 1-SER-99–101. Appellants also refused to acknowledge their abandonment of the "psychiatric evaluation" denial rationale before litigation, arguing that the Family "did not challenge" that reasoning. 1-SER-61. Appellants argued that because they submitted their decisions to an external reviewer, that was somehow indicia of the reasonableness of their decision, even though the external reviews suffered from many of the same problems that plagued Premera's denials. 1-SER-101. And, in a late-made attempt to address the letter of medical necessity written by Wood, Appellants argued that the Court should not consider her opinion because it did not speak to "what is medically necessary[] as defined by the plan." 1-SER-101–102 (citation, quotation, and emphasis omitted).

In opposition to Appellants' Motion, the Family noted that many of the factual determinations and evidence relied on were not communicated to the Family before litigation, and that such facts were not properly before the Court. 1-SER-38–45. The Family, to the best of their ability, numbered and disputed the statement of facts offered by Appellants in their brief. 1-SER-40–45.

The Family noted that Premera "fail[ed] to engage with [their] letters of medical necessity" and "simply repeated their earlier conclusions… without

addressing the reasons" that A.B.'s providers rightly believed he needed treatment. 1-SER-47–50. They argued that the Court's review of the denials should be limited to the text of the denial letters sent to them before litigation. *Id* (citing *D.K. v. United Behavioral Health*, 67 F.4th 1224, 1242-43 (10th Cir. 2023) and *Ministeri v. Reliance Std. Life Ins. Co.*, 42 F.4th 14, 27-28 (1st Cir. 2022)). Because Premera offered no explanation for its ignorance and rejection of the opinions of those who treated A.B., it acted arbitrarily and capriciously. 1-SER-48. And because Premera agreed that a portion of A.B.'s care was medically necessary when it approved coverage for his first month at Catalyst, Premera abused its discretion when it denied further coverage "despite a complete lack of evidence" that A.B.'s diagnoses or condition had changed or improved between the last covered day and the first denied day. 1-SER-48–49.

With respect to Second Nature, the Family argued that "vague and repeated reference" to contract language that "specifically excludes… wilderness therapy" was not enough to satisfy Premera's obligation to disclose the reason for denial. 1-SER-50. They also objected to the assertion that denial was based on the "recreational, camp and activity programs" provision of the Plan, which was never cited in any denial letter. 1-SER-51.

Appellants' opposition largely restated the arguments they had made in their Motion, and their reply in support did the same. See 1-SER-58–83; 1-SER-22–36.

37

Appellants failed to meaningfully dispute any of the facts articulated in the Family's Motion, opting instead for a one-sentence omnibus statement "incorporate[ing] by reference the factual and procedural background in their Motion for Summary Judgment." 1-SER-59. Appellants continued to make late-made attempts to supplement the scant rationale in their denial letters and otherwise refute uncontested evidence offered by the Family before litigation. See generally 1-SER-58–83.

To argue Premera had adequately engaged with the appeals, Appellants argued only that "'Premera's denial letter stated that it reviewed 'the medical records your provider, Catalyst, sent to us,' and explained that '[i]nformation from your provider does not show' that A.B.'s symptoms satisfied the InterQual criteria." 1-SER-26. The only evidence Appellants pointed to in attempting to establish Premera had somehow fulfilled its meaningful dialogue obligations was conclusory statements that it "considered all of the materials submitted." 1-SER-28. Appellants pointed to no language in the denial letters disputing or responding to the Family's evidence *at all*. *Id*.

The Family's reply noted Appellants' failure to dispute the material facts articulated in their Motion, and that the Family's facts should be accepted as undisputed. 1-SER-6–7. Additionally, the Family noted that Appellants' failure to

dispute or object to their facts denied them the opportunity to address any objections Appellants might have had. *Id.*

The Family reiterated that Appellants had never referenced a specific "provision of the Plan supporting [their] conclusion" that Second Nature was excluded. 1-SER-8. And they argued that if Appellants wished to apply any exclusion, it was their burden to explain its application in the denial letters, something that Premera had failed to do by failing to substantively dispute the Family's pre-litigation assertion that Second Nature was not a "wilderness" or "recreational, camp, and acitivity based program." 1-SER-9.

Additionally, the Family clarified that Premera had abandoned its argument that Catalyst did not meet the Plan's facility requirements. 1-SER-10. The Family had argued that Catalyst met the Plan's definition of a provider, and that the internal criteria used by Premera were "inapplicable or superseded by the terms of the Plan." 1-SER-10. And in response, Premera "did not re-raise this as a rationale for denial" and could not resurrect it in litigation. *Id.* The Family pointed out that they had addressed the contradiction between Premera's initial approval of 30 days of treatment at Catalyst and their subsequent denial when A.B. was still exhibiting the same symptoms, and that they had been ignored. 1-SER-13.

After briefing and before oral argument, the Family submitted supplemental authority referencing several cases comparable to their own. 1-SER-2–4. One such

case was the Tenth Circuit's opinion in *Ian C. v. UnitedHealthcare Ins. Co.*, in which that Court elaborated on the "meaningful dialogue" requirement the Family offered in briefing and embraced by this Circuit in *Booton*. 87 F.4th 1207 (10th Cir. 2023); 110 F.3d 1461, 1463 (9th Cir. 1997). The Tenth Circuit had addressed a similar failure to address dual diagnoses of mental health and substance use disorders to be arbitrary and capricious. 1-SER-3–4. Another such case was *Robert B. v. Premera Blue Cross*, 2023 U.S. Dist. LEXIS 198144, *33-38 (D. Utah 2023). 1-SER-3. That case looked at similar facts, where Premera had approved thirty days of coverage and then decided to deny benefits thereafter without explanation, and found it arbitrary and capricious. *See Robert B.*, 2023 U.S. Dist. LEXIS 198144, *33-38.

The parties held oral argument on December 11, 2023. 1-SER-111–158. While discussing the applicability of the purported "outward bound, wilderness, camping or tall ship programs or activities" exclusion, the Family clarified that none of the listed programs or activities in the exclusion were "licensed and accredited in the same way as Second Nature." 1-SER-119. Second Nature was a therapeutic facility and was not merely a recreational or activity-based program. *Id*. They noted that all of the listed program types in that exclusion "make no attempt to be licensed or accredited" or "to bill themselves as a program to health insurers such as Premera." *Id*.

40

In oral argument, the Court posited "[i]t seems that [Second Nature, a licensed outdoor youth treatment program, and outward bound activities or programs are] very different… [o]ne seems to be a therapy program where kids sleep outside, and the other one appears to be an entertainment and skill-building type program that has nothing to do with therapy." 1-SER-120. The Family clarified that Premera's failure to "clearly distinguish" between "recreational-type or experiential-type wilderness programs" and "therapeutically-based, licensed and accredited programs" like Second Nature made clear Premera's failure to establish the applicability of the exclusion and to fulfill its full and fair review obligations. 1-SER-120. They also noted that Premera's subsequent decision to approve A.B.'s second stay at Second Nature in late 2020 spoke to the fact that Second Nature was not "just some experiential or recreational kind of activity." 1-SER-121.

As to Catalyst, the Family noted that Premera had abandoned its intensity of service arguments, and that the only basis for denial properly considered was the medical necessity of A.B.'s care. 1-SER-122. In doing so, they stated there was "no indication that Premera ever presented or tried to present that [A.B.'s] condition had changed or improved in any significant way between the [] days that were covered by Premera [and the days that were] denied for lack of medical necessity." 1-SER-122. They again pointed to the letter of medical necessity from A.B.'s therapist, and noted that there was "no reference in the [denial] letters to the

fact that there was significant treatment [] being provided to this young man [for] his substance-use disorder." 1-SER-122–123.

The Court confirmed that Premera's reviewer only looked at notes from the facility, did not inquire of A.B.'s treating therapist or providers, and did not examine A.B. at any point. 1-SER-124–125. The Family also referenced *N.C. v. Premera Blue Cross* to assert that the terms of the Plan superseded guidelines proffered by Premera, and to clarify that if a Plan does not explicitly incorporate particular guidelines or standards, claimants are free to offer up alternatives. 1-SER-126–127; 667 F. Supp. 3d 1102, 1115-1116 (W.D. Wash. 2023) (*affirmed at* 2024 U.S. App. LEXIS 13772, unpublished).

In oral argument, Appellants admitted Second Nature was licensed as an outdoor youth program, but erroneously stated that the "outdoor youth program license doesn't require a facility to provide any mental health treatment." 1-SER-131; Utah Code Annotated §26B-2-101(34). Appellants articulated that Premera's real reason for denying the claim was that Second Nature did not have a "residential treatment license, [and only had] the outdoor youth program license, [so Premera] denie[d] the claim." 1-SER-132.

As to Catalyst, Appellants articulated for the first time Premera's supposed reason for denying coverage after authorizing 30 days of treatment – that apparently, Catalyst had not submitted a "[p]sychiatric report, a [sic] current

symptoms and impairments, progress notes, and a discharge plan." 1-SER-133–

134. Because Appellants could not cite to any denial letter that would have

informed the Family of this, they referred to Premera's internal notes. 1-SER-134–

135. Additionally, she falsely stated that the Family had submitted "none of the

requested records." 1-SER-135; 3-ER-163–169 (showing medical records were

submitted alongside the appeal); 3-ER-199–260, 2-SER-161–381, 3-ER-250–286,

3-ER-298–301 (Catalyst medical records, including the psychiatric evaluation of

Meghan Kunz, PMHNP, and dozens of progress notes indicating A.B.'s current

diagnoses, symptoms, and impairments). Appellants continued their reliance on

rationale and facts that Premera did not articulate in any of the denial letters

communicated to the Family. 1-SER-133–139.

  When asked by the Court if there was "anything in the policy that requires

that this treatment [be rendered by] an M.D. or a psychiatrist, as opposed to a

psychologist or MSW or a nurse practitioner," Appellants admitted that treatment

could "be appropriately provided by any one of those disciplines." 1-SER-139.

Additionally, when the Court rightly noted that there was "different analysis to be

done when there is a dual diagnosis and [the patient has] addiction issues,"

Appellant admitted that those issues "can [] trigger the appropriateness of

[treatment in a] residential treatment center." 1-SER-144.

When pressed on this topic, Appellants argued that because A.B. had not done any drugs since immediately prior to his admission to Second Nature, he did not need further treatment. 1-SER-145. The Court noted that "because someone hasn't used [in treatment] doesn't mean that they're not addicted when they don't have access, and that's one of the reasons you keep them confined." 1-SER-145. And in response, Appellants argued without support that A.B. was not receiving "any treatment at all" for his addiction issues, stating incorrectly that substance use disorder and alcohol use disorder were not "even in the diagnoses that they did." 1-SER-145–146.

In response, the Family reminded the Court that many, if not all, of the arguments advanced by Appellants were "simply not present in their denial letters." 1-SER-151. They noted that Appellants' failure to show any of their arguments were based on the language of the denial letters was an implicit admission that they failed to raise those arguments in the pre-litigation appeal process. 1-SER-151–152. The Family noted the stark disparity between the information and arguments advanced by the Family and the conclusory, deficient statements in Premera's denial letters. 1-SER-153.

The Family argued that they had already borne their burden of proving that all of A.B.'s treatment was medically necessary, and again directed the Court to the analogous *Ian C.* decision from the Tenth Circuit discussing very similar

issues. 1-SER-153. In response to the Family's assertion that Premera had failed to cite to any of A.B.'s medical records or meaningfully explain its reasons for denying the claim, all Appellants had to offer was that they had repeatedly "sen[t] the InterQual criteria." 1-SER-156.

## G. THE DISTRICT COURT'S OPINION AND THE PLAN TERMS.

The District Court issued its opinion on December 18, 2023. 1-ER-14–38. The District Court concluded the Plan covers "mental health services to manage or lessen the effects of a psychiatric condition." 3-SER-374; 1-ER-15. Additionally, the Court explained that services under the Plan must be medically necessary, meaning that:

> A physician, exercising prudent clinical judgment, would provide [the services] to a patient for the purpose of preventing, evaluating, diagnosing or treating an illness, injury disease or its symptoms and that were:
> - In accordance with generally accepted standards of medical practice;
> - Clinically appropriate, in terms of type, frequency, extent, site and duration, and considered effective for the patient's illness, injury, or disease; and
> - Not primarily for the convenience of the patient, physician or other health care provider, and not more costly than an alternative service or sequence of services at least as likely to produce equivalent therapeutic or diagnostic results as to the diagnosis or treatment of that patient's illness, injury or disease.

1-ER-15; 4-ER-424.

The District Court noted that the Plan contained "two exclusions" relevant to this matter. 1-ER-16. In the Plan's mental health benefits section, the Plan stated

that it "doesn't cover… Outward bound, wilderness, camping or tall ship programs or activities." 1-ER-16; 3-ER-375. The Court rightly noted that the Plan contained no definition for those terms. 1-ER-16. The Court also noted the more general exclusion for "recreational, camp and activity programs." 1-ER-16; 3-ER-396. The Court noted that unlike the other exclusion, this one defined at least some of these programs, including but not limited to recreational camps, creative art, play, sensory movement, dance therapy, equine programs, and exercise programs in this definition. 1-ER-16; 3-ER-396.

The District Court observed that the Plan defined a "provider" broadly, including any "health care practitioner or facility that is in a licensed or certified provider category regulated by the state in which the practitioner or facility provides care, and that practices within the scope of such licensure or certification." 1-ER-16; 4-ER-426. The Plan provides Premera "discretionary authority to determine eligibility for benefits and construe the terms of the plan." 1-ER-16; 3-ER-342.

The District Court recounted A.B.'s medical and treatment history, noting A.B.'s substance use challenges and the recommendations and findings of A.B.'s treating professionals with particularity. 1-ER-17–21. It also recounted the appeals and denials exchanged during the pre-litigation appeal process. 1-ER-21–26. The District Court noted that Premera's final denial regarding Second Nature

46

articulated that it was "'based on the contract language which specifically excludes coverage on [sic] wilderness therapy.'" 1-ER-22.

In addition, the District Court explained that every Catalyst denial letter beyond the first "did not include any statement concerning the lack of a psychiatric evaluation, daily clinical assessments, thrice weekly therapy, or a discharge plan – i.e., the facility-based reasons for denial expressed in the initial denial." 1-ER-24–25. The Court also noted that the Family was under the impression Premera had abandoned those facility-based reasons to deny the claim. 1-ER-25.

The District Court properly found that Premera abused its discretion in concluding the Plan excluded Second Nature. 1-ER-27–31. The District Court noted that Premera had come to two conclusions in order to deny the claim: that Second Nature was a "wilderness program" despite its licensure, and that it fell within the Plan's exclusion for "outward bound, wilderness, camping or tall ship programs or activities." 1-ER-27 (quotation and citation omitted). But it also rightly noted that Premera had failed to provide "any reasoned explanation as to *why* the Plan's exclusion should be read so expansively or applied to the specific mental health treatment provided by Second Nature." *Id* (emphasis added).

The District Court reasoned that Premera's repeated failure to provide a reasonable "interpretation or application" of the Plan's exclusion to Second Nature was problematic because Premera "presented no analysis as to why a licensed

medical healthcare provider who treats patients in an outdoor setting falls within this exclusion." 1-ER-28. The Court referenced A.B.'s treatment notes to establish that he received "substantial therapeutic support" while at Second Nature. 1-ER-29. The Court also correctly noted that Premera's "final denial shows [] it simply rewrote the Plan's terms, incorrectly stating that 'the contract language… specifically excludes coverage [of] wilderness therapy…' [and] [t]he Plan contains no such 'specific' language." 1-ER-29; 4-ER-534. The District Court noted that merely listing "recreational activities" in the Plan's exclusions was not enough to justify "Premera's expansive and unexplained rewrite of the exclusion to reach mental healthcare in an outdoor setting." 1-ER-29. If the Plan wanted to exclude coverage of mental healthcare that was provided outdoors writ large, it could have – but it had to explicitly say so. *Id.*

The Court also correctly found that Premera could not claim A.B.'s treatment at Second Nature was not medically necessary because it had not raised this rationale when the Family would have had an opportunity to "challenge [that] determination," and had instead waited until the final denial. 1-ER-30. The District Court found an abuse of discretion, but did not award payment of benefits outright. Instead, the District Court noted that "[o]n remand, Premera may not deny coverage based on [medical necessity.]" 1-ER-31.

The District Court also rightly found that Premera's denial of coverage for A.B.' treatment at Catalyst was an abuse of discretion. 1-ER-31–37. The District Court cited the letters of medical necessity from A.B.'s treating providers and noted that they were entitled to "considerable weight." 1-ER-31–32. The Court concluded that the Plan's medical necessity definition included services that a "physician, exercising prudent clinical judgment, would provide," not that only a physician could support such a finding. 1-ER-32. Those letters, the Court stated, conclusively established that A.B.'s treatment continued to be medically necessary, especially considering his risk for relapse and the persistence of his symptoms. 1-ER-31–32.

The Court also gave weight to Premera's initial determination that A.B.'s first thirty days of treatment at Catalyst were medically necessary. 1-ER-32. Having already approved coverage under the circumstances, Premera's initial finding put it in the position of "having to explain why A.B.'s stay was no longer medically necessary." 1-ER-32. Having failed to explain how A.B. had recovered enough to be safely and effectively treated in an outpatient setting in light of his "specific history and his treating therapists' recommendations." Premera failed to provide "reasoned explanations and the Court [was] left with a firm and definite conviction that the decision is clearly erroneous." 1-ER-32–33.

Looking to the first denial of A.B.'s treatment at Catalyst, the Court found that the letter was "vague and equivocates as to what rationale Premera relied on to deny coverage… [this] letter lacks sufficient detail to allow [the Family] to respond and engage in a meaningful dialogue." 1-ER-33. The District Court concluded that the second denial was similarly deficient and refused to acknowledge, refute, or otherwise engage with the arguments or letters of medical necessity the Family submitted. 1-ER-34. Nor, the Court concluded, did this denial letter "cite to any evidence that A.B.'s condition had improved since entry to Catalyst." 1-ER-34. Having failed to fulfill its obligations, and having failed to address the ongoing risk of A.B.'s possible "addiction relapse," Premera's denial was arbitrary and capricious. 1-ER-35–36.

The Court concluded its discussion of the Family's claims for benefits with an articulation of the deficiencies in Appellants' reliance on InterQual. 1-ER-36–37. Because the InterQual guidelines were not "part of" the Plan, and were only consistent with the Plan's requirements, they were "advisory at best" and could not supersede the Plan's terms. 1-ER-36. Additionally, the Court rightly noted that "even if the InterQual guidelines were useful in assessing medical necessity, [Premera's] denials failed to explain why they support denial of coverage." 1-ER-37. Additionally, the Court rightly determined that Premera abandoned its facility-

specific denial rationale when responding to the appeals submitted by the Family. 1-ER-37.

The Court, having determined that the Family were entitled to judgment in their favor on their benefits claims, denied their remaining MHPAEA claims as moot. *Id*. And acknowledging that the record alone could not allow them to determine what sums were due, the Court remanded the claims to Appellants to "approve and pay the claims consistent with this Order and the Plan." 1-ER-38. The Family moved for attorneys' fees, and the Court granted their motion, finding that they had sufficiently prevailed on the merits and that Appellants had acted culpably in abusing their discretion to deny benefits. 1-ER-1–11.

## SUMMARY OF ARGUMENT

The District Court did not err in holding that the Family were entitled to a remand for "approv[al] and pay[ment of] the claims consistent with" its Order and the language of the Plan. 1-ER-38.

*First*, the Court rightly refused to allow Premera to rely on extra-record rationale and evidence it offered only in briefing. Evidence not communicated to claimants before litigation in the denial letters is not a proper source to support denial of benefits, because claimants never would have had an opportunity to review that evidence or respond to it. *See Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 720 (9th Cir. 2012); *also Collier v. Lincoln Life Assurance Co. of Boston*, 53

F.4th 1180, 1182-1186 (9th Cir. 2022); *see also D.K. v. United Behavioral Health*, 67 F.4th 1224, 1242-43 (10th Cir. 2023). By "failing to make these arguments" or provide this evidence in the pre-litigation appeal process, Premera "effectively held those reasons in reserve rather than communicate [them] to [the Family]" *Collier*, 53 F.4th at 1887.

For the same reason, Appellants may not rely on abandoned rationale that the Family challenged and that Premera failed to re-assert, because doing so would prevent the Family from addressing them before litigation and insulate the rationale from judicial review. *See Collier*, 53 F.4th at 1188-1189 (9th Cir. 2022); see also 29 C.F.R. §2560.503-1(g)(1)(i-vii); see also 29 C.F.R. §2560.503-1(h); also 29 U.S.C. §1133; also *Harlick*, 686 F.3d at 719 (9th Cir. 2012).

*Second*, the District Court rightly concluded that Premera failed to meet its burden to establish the applicability of the Plan exclusion with respect to its denial of coverage for A.B.'s treatment at Second Nature. 1-ER-27–31. Appellants bore the burden of proving before litigation that the Plan exclusion applied. 1-SER-17; *K.H.B. v. United Healthcare Ins. Co.*, 2018 U.S. Dist. LEXIS 174548, *10-11 (N.D. Cal. 2018) (quoting *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1319 (10th Cir. 2009)); *see also LaAsmar v. Phelps Dodge Corp. Life*, 605 F.3d 789, 814 (10th Cir. 2010); *also Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000).

Because the Family disputed the applicability of the exclusion and provided evidence that Second Nature was not merely a "wilderness" program or recreational camp, Premera's failure to explain its application or refute the Family's assertion the exclusion did not apply was damning. *See Wesco Ins. Co. v. Brad Ingram Constr.*, 2024 U.S. App. LEXIS 1488, *2 (9th Cir. 2024). And when Premera relied on an unexplained rewrite of the Plan's language in its final denial to argue that "wilderness therapy" was excluded, it abused its discretion and misconstrued the terms of the Plan. 1-ER-22; 1-ER-29; 4-ER-534.

*Third*, the District Court correctly found that Premera had abused its discretion substantively and procedurally in denying the Family's claims for coverage of treatment at Catalyst. 1-ER-31–37. Premera was required to cite to medical evidence in its denials to establish why care was no longer medically necessary, especially given it approved A.B.'s treatment as medically necessary when he displayed largely similar symptoms. See 29 C.F.R. §2560.503-1(g)(1)(v); 29 U.S.C. §1133(2).

Premera was obligated to engage with the opinions of A.B.'s treating providers in order to provide a full and fair review. *See generally Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *see also Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); 29 U.S.C. §1133(2). Premera had a duty to respond to or refute those opinions if it

wanted its decision to withstand arbitrary and capricious review. *See D.K. v. United Behavioral Health*, 67 F.4th 1224, 1241 (10th Cir. 2023). The district court properly gave greater weight to the uncontested opinions of those who actually treated and examined A.B. rather than Premera's reviewers, who simply reviewed his file and did not dispute the opinions of A.B.'s treating providers. 1-ER-32; *See Salomaa*, 642 F.3d at 676 (9th Cir. 2011); *also Smith v. Hartford Life & Accident*, 2013 U.S. Dist. LEXIS 13868, at *71 (N.D. Cal. 2013); *also Dominic W. v. Northern Trust Co. Employee Welfare Benefit Plan*, 392 F. Supp. 3d 907, 917-919 (N.D. Ill. 2019).

Premera was wrong when it "complete[ly] disregard[ed] [] a contrary conclusion without [any] explanation." *Salomaa*, 642 F.3d at 679 n.35; *see also* 29 U.S.C. §1133(2); *also Ian C. v. UnitedHealthCare Ins. Co.*, 87 F.4th 1207, 1222-1223 (10th Cir. 2023);  *also Booton*, 110 F.3d at 1463 (9th Cir. 1997). As a result, the District Court was properly concerned with whether Premera's benefit determination was the product of a principled and deliberative reasoning process. Premera's decision was made even more problematic by its inexplicable ignorance of A.B.'s medical records, including his drug use and cannabis and alcohol use disorders, which the Family's evidence established would resurface should he receive a lower level of care. *See Ian C.*, 87 F.4th at 1221 (10th Cir. 2023).

*Fourth*, the district court properly awarded the Family attorneys' fees. 1-ER-2–11. Appellants do not argue the reasonableness of the fee, and only argue that should they prevail in this appeal in full, the award should be reversed. Prevailing ERISA plaintiffs can be awarded attorneys' fees whenever they find "some degree of success on the merits," and they did so here. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-256 (2010).

## STANDARD OF REVIEW

The district court resolved the claims for benefits on cross motions for summary judgment and judgment on the record, which are "merely [] vehicle[s] for deciding the case; the usual tests of summary judgment, such as whether a genuine dispute of material fact exists, do not apply." *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999).[3] When a district court examines an ERISA administrator's claim determination, it "review[s] the employee's claim as it would any other contract claim – by looking to the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 112-13 (1989). The district court's conclusions of law are reviewed *de novo*. *See Eun Sug Cha v. 1199SEIU Health Care Emples. Pension Fund*, 672 F. App'x 714, 714 (9th Cir. 2016).

---

[3] The Family notes that they filed a Motion for Judgment on the Record, which they at times erroneously described as a motion for summary judgment, and Appellants filed a Motion for Summary Judgment.

Appellants offer no authority for their conclusion that this Court should not defer to the District Court's findings of fact. Br. Aplt. 25. This Circuit reviews the district court's findings of fact for "clear error." *Day v. AT&T Disability Income Plan*, 685 F.3d 848, 852 (9th Cir. 2012) (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006)). Appellants also failed to dispute or otherwise object to the facts as articulated by the Family in the District Court, and this Court should consider those facts undisputed for purposes of its review. See 1-SER-59; see also 1-SER-6–7.

When the reviewing court finds that the rationales asserted in an administrator's pre-litigation denial correspondence are illogical, implausible, without support from the record, or that the administrators' denial letters do not engage in meaningful dialogue, it must find that the administrator acted arbitrarily and capriciously. *See Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *see also D.K. v. United Behav. Health*, 67 F.4th 1224, 1242 (10th Cir. 2023); *Boyd v. Bell*, 410 F.3d 1173, 1178 (9th Cir. 2005). A finding is "clearly erroneous when although there is evidence to support it, the reviewing [body] on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe and Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 622 (1993).

ERISA imposes a "prudent man standard of care" that requires an administrator to "discharge [its] duties with respect to a plan solely in the interests of participants and their beneficiaries." 29 U.S.C. §1104(a)(1). The Supreme Court has called that requirement "a special standard of care" to ensure administrators provide a "full and fair review" of claims. *Firestone*, 489 U.S. at 113. Accordingly, ERISA's claims procedure regulations call for "a meaningful dialogue between ERISA plan administrators and their beneficiaries." *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); see also 29 C.F.R. 2560.503-1(g). Review of the denial rationale advanced by Appellants is properly limited to the denial letters, and the Court should not consider any evidence or arguments that the claimants had no opportunity to respond to. *D.K. v. United Behavioral Health*, 67 F.4th 1224, 1239-41 (10th Cir. 2023); *Collier v. Lincoln Life Assurance Co. of Bos.*, 53 F.4th 1180, 1182 (9th Cir. 2022). For claims administrators to justify denial of benefits in litigation using evidence or rationale that were not contained in the denial letters is an abuse of discretion.

## ARGUMENT

### A. APPELLANTS CANNOT RELY ON ABANDONED OR POST-HOC RATIONALE TO SUPPORT THEIR DECISION TO DENY BENEFITS.

The Court rightly refused to allow Premera to rely on the extra-record rationale and evidence it offered only in briefing. Evidence not communicated to

claimants before litigation in the denial letters is not a proper source to support denial of benefits, because claimants never would have had an opportunity to review that evidence or respond to it. *See D.K.*, 67 F.4th at 1242-43 (10th Cir. 2023); *see also Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 720 (9th Cir. 2012); *also Collier*, 53 F.4th at 1182-1186 (9th Cir. 2022). By "failing to make these arguments" or provide this evidence in the pre-litigation appeal process, Appellants "effectively held those reasons in reserve rather than communicate [them] to [the Family]" *Collier*, 53 F.4th at 1887.

Both Appellants' briefing before the District Court and their briefing before this Circuit address evidence and arguments the Family submitted in ways that were never communicated in Premera's denial letters. See generally Br. Aplt (compared to 3-ER-321, 3-ER-332, 3-ER-334–335, 4-ER-531–532, and 4-ER-534). It is inappropriate for Appellants to "sandbag" the Family via "rationale [they] adduce[] only after the suit has commenced." *Harlick*, 686 F.3d at 720.

For the same reason, Appellants cannot rely on abandoned rationale that were not re-asserted in subsequent denial letters by Premera, because doing so would prevent claimants from addressing them before litigation and insulate the rationale from judicial review. *See Collier*, 53 F.4th at 1188-1189 (9th Cir. 2022); see also 29 C.F.R. §2560.503-1(g)(1)(i-vii); also 29 C.F.R. §2560.503-1(h); 29 U.S.C. §1133; *Harlick*, 686 F.3d at 719 (9th Cir. 2012). Appellants' argument that

58

they could hide behind abandoned denial rationale to support their decision because the "Level 1 appeal never challenged Premera's determination" that Catalyst met the requirements for coverage is simply wrong. Br. Aplt. 42. Appellants read *E.W. v. Health Net Life Ins. Co.* too broadly. 86 F.4th 1265 (10th Cir. 2023). In that case, the Tenth Circuit decided not to fault a claims administrator for not responding to an argument that the claimants "failed to raise[:]" that Health Net had not considered I.W.'s qualification for treatment under the applicable eating disorder standards when the claimants had not asked Health Net to consider those standards before litigation. *Id*, at 1296. But unlike *E.W.*, the Family did advance an argument that Premera had to respond to in their appeal: that the criteria Premera applied were superseded by other coverage terms of the Plan, and that Premera could not unilaterally deny coverage of something that plainly qualified under the Plan based on undisclosed external requirements. 3-ER-161. Premera provided no meaningful response to that argument. 3-ER-334.

When a claimant makes such an argument, and the administrator does not re-assert this reason to deny the claim or explain why the claimant was wrong, the administrator cannot resurrect it in litigation. Appellants cannot paper this over with responsive statements made in litigation, let alone on appeal to this Court. See Br. Aplt. 44. The "reason[s] for the denial must be stated in reasonably clear language," and Premera did not communicate this rationale after Appellees'

challenged it in either of its subsequent denials. *Booton v. Lockheed Medical Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); 29 C.F.R. §2560.503-1(g); 1-ER-37. To allow Appellants to revive this rationale only in litigation "preclud[es] the plan participant from responding to that rationale for denial [in the pre-litigation appeal process,]" and maneuvers like this that have "the effect of insulating the rationale from review [] contravene[] the purpose of ERISA." *Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871-872 (9th Cir. 2008); *see also See Metaxas v. Gateway Bank F.S.B.*, 2022 U.S. Dist. LEXIS 154218, at *45-46 (N.D. Cal. Aug. 26, 2022).

The District Court got it right, and Appellants should not be free to rely on rationale that Premera abandoned when challenged or that Premera failed to raise in a manner allowing the claimants an opportunity to respond. 1-ER-30–31; 1-ER-37. Premera did not engage in "meaningful dialogue," and failed to respond to or address the arguments presented by the Family in the pre-litigation process and ignored their requests that it fulfill its fiduciary duty to do so.

## B. PREMERA DID NOT MEET ITS BURDEN TO PROVE THE APPLICABILITY OF A PLAN EXCLUSION TO SECOND NATURE.

Appellants bear the burden of proving the Plan exclusion applied before litigation. 1-SER-17; *w*; *K.H.B. v. United Healthcare Ins. Co.*, 2018 U.S. Dist. LEXIS 174548, *10-11 (N.D. Cal. 2018) (quoting *Rasenack ex rel. Tribolet v. AIG Life Ins. Co.*, 585 F.3d 1311, 1319 (10th Cir. 2009)); *see also Wise v. Maximus*

*Fed. Servs.*, 478 F. Supp. 3d 873, 888 (N.D. Cal. 2020); *Pitman v. Blue Cross & Blue Shield of Okla.*, 217 F.3d 1291, 1298 (10th Cir. 2000). The District Court rightly concluded that Premera failed to meet this burden to establish the applicability of the Plan exclusion with respect to its denial of coverage for A.B.'s treatment at Second Nature. 1-ER-27–31.

Because the Family disputed the applicability of the exclusion and provided evidence that Second Nature was not merely a "wilderness" program or recreational camp, Premera's failure to explain its application or refute the assertion that the exclusion did not apply before litigation was damning. *See Dubaich v. Conn. Gen. Life Ins. Co.*, 2013 U.S. Dist. LEXIS 108446, *22-26 (C.D. Cal. 2013) (indicating that "simply rel[ying] on [] prior conclusions" is not sufficient to address new information provided on appeal when attempting to prove an exclusion).

Second Nature was licensed as an "outdoor youth treatment" facility, and Premera provided no explanation for its application of an undefined exclusion for "wilderness" programs to Second Nature in any of its denial letters. 3-ER-333. The Plan clearly provides for coverage of any "inpatient care" rendered by a "provider," and does not limit its coverage to only residential treatment facilities. 3-ER-374; 3-ER-333. Yet Appellants indicated that Premera had denied coverage because it observed Second Nature did not have a "residential treatment license,

61

[only had an] outdoor youth program license, and [as such] denie[d] the claim." 1-SER-132. Inexplicably narrowing the Plan's terms to find a means to deny the claim goes against Premera's fiduciary duties and is an abuse of discretion.

The same is true of Premera's unexplained rewrite of the Plan's language in its final denial to argue that "the contract language… specifically excludes coverage on [sic] wilderness therapy." 1-ER-22; 1-ER-29; 4-ER-534. Nowhere in the Plan is "wilderness therapy" excluded, and the Plan contains no such specific language. See generally 3-ER-340–412 and 4-ER-415–428; 1-ER-29. Setting aside compliance with MHPAEA, the District Court was right to say that if Appellants "intended to exclude mental healthcare provided in an outdoor setting [they] could have, but did not say so." 1-ER-29. For Premera to argue that an exclusion for undefined, recreational "wilderness" programs and activities could be properly read to exclude *any* covered mental health treatment occurring in an outdoor setting is risible. And even if its construction were reasonable, it had a duty to explain as much to the Family when they challenged it. 1-ER-30; *see also Boyd v. Bell*, 410 F.3d 1173, 1178 (9th Cir. 2005). The District Court correctly determined that Premera's repeated conclusory assertion that the exclusion applied to Second Nature, in the face of the Family's evidence that it did not, was arbitrary and capricious.

### C. PREMERA ABUSED ITS DISCRETION BY IGNORING THE EVIDENCE SUBMITTED TO ESTABLISH A.B.'S TREATMENT AT CATALYST WAS MEDICALLY NECESSARY.

The District Court correctly found that Premera had abused its discretion substantively and procedurally in denying the Family's claims for coverage of A.B.'s treatment at Catalyst. 1-ER-31–37. Premera had to cite to medical evidence in its denials to establish why care was no longer medically necessary, especially given it approved A.B.'s treatment as medically necessary when he displayed largely the same symptoms. See 29 C.F.R. §2560.503-1(g)(1)(v) (requiring medical necessity denials to be supported by an "explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances"); 29 U.S.C. §1133(2).

Premera was obligated to engage with the opinions of A.B.'s treating providers in order to provide the Family a full and fair review. *See generally Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011); *see also Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997); also 29 U.S.C. §1133(2). Premera had a duty to respond to or refute those opinions if it wanted its decision to withstand arbitrary and capricious review. *See D.K. v. United Behavioral Health*, 67 F.4th 1224, 1241 (10th Cir. 2023). The district court properly gave greater weight to the opinions of those who actually treated and examined A.B. than to Premera's reviewers, who simply reviewed his

file. 1-ER-32; *See Salomaa*, 642 F.3d at 676 (9th Cir. 2011); *Smith v. Hartford Life & Accident*, 2013 U.S. Dist. LEXIS 13868, at *71 (N.D. Cal. Jan. 30, 2013); *also Dominic W. v. Northern Trust Co. Employee Welfare Benefit Plan*, 392 F. Supp. 3d 907, 917-919 (N.D. Ill. 2019).

If Premera wanted its decisions to stand, and its findings truly did derive "primarily from the absence of record evidence supporting continuing coverage," it would have paid the claim as soon as the Family presented considerable evidence that A.B.'s ongoing treatment at Catalyst was medically necessary under the Plan. See Br. Aplt. 38; *E.W. v. Health Net Life Ins. Co.*, 86 F.4th 1265, 1301 (10th Cir. 2023); 3-ER-163–169; 3-ER-174; 3-ER-187; 3-ER-197; 3-ER-199–260; 2-SER-161–381; 3-ER-250–286; 3-ER-298–301. Instead Premera paid no heed to A.B.'s medical records, including his most significant struggles: persistent drug use and cannabis and alcohol use disorders, which the Family's evidence established would resurface should he not receive treatment at Catalyst. *See Ian C.*, 87 F.4th 1207, 1221 (10th Cir. 2023); 3-ER-150–151; 3-ER-163–169; 3-ER-172–174; 3-ER-196–197.

Premera could not point to InterQual, cite to none of A.B.'s medical records, and conclude A.B. could be safely treated at a lower level of care when the evidence submitted by the Family clarified that Catalyst was the lowest level of care "considered effective" to treat his needs. *Id*; 4-ER-424. In fact, had the Family

followed Premera's directions, rather than trusted the opinions of A.B.'s treating providers, the likelihood of his relapse in an outpatient setting might have made such care not medically necessary under the Plan. 4-ER-424.

The Family presented evidence supporting their claim for coverage, and Appellants ignored it. And where Appellants "complete[ly] disregard[ed] [] a contrary conclusion without so much as an explanation," the district court was properly concerned with whether Premera's benefit determination was the product of a principled and deliberative reasoning process. *Salomaa*, 642 F.3d at 679 n.35; see also 29 U.S.C. §1133(2); *also Ian C.*, 87 F.4th at 1222-1223 (10th Cir. 2023); *Booton*, 110 F.3d at 1463 (9th Cir. 1997). Appellants had to look to the medical evidence provided by the Family and explain how A.B.'s medical circumstances were evaluated under the Plan in light of their arguments. Failure to do so is unacceptable. *See Dwyer v. United Healthcare Ins. Co.*, 2024 U.S. App. LEXIS 23866, *18 (5th Cir. 2024). Appellants abused their discretion procedurally by refusing to respond to the Family's proffered evidence, and abused their discretion substantively by ignoring the uncontested evidence establishing A.B. could not be safely and effectively treated in accordance with the Plan's medical necessity definition in any lower level of care than what was provided at Catalyst.

//

//

### D. THE DISTRICT COURT PROPERLY AWARDED ATTORNEYS' FEES.

The district court properly awarded the Family attorneys' fees. 1-ER-2–11. Appellants' argument assumes their success before this Court, and also fails to address what should happen if they were to be only partially successful. Prevailing ERISA plaintiffs can be awarded attorneys' fees whenever they find "some degree of success on the merits," and that includes when they obtain a court ruling establishing an administrator's failure to engage in meaningful dialogue and any reversal of a denied claim. *See Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 252-256 (2010). Even if this Court finds merit in one of Appellants' arguments, unless it wholly overturns the District Court's decision and directs judgment in favor of Appellants, the attorney fee award should stand. Additionally, a claimant's rights to full and fair review under 29 U.S.C. §1133 are not purely procedural, and securing their substantive right to an "ERISA-compliant review" is enough to warrant a claim for attorneys' fees. *See, e.g., Scott v. PNC Bank Corp. & Affiliates Long Term Disability Plan*, 2011 U.S. Dist. LEXIS 69693, *29 (D. Md. 2011); *see also Zall v. Std. Ins. Co.*, 2023 U.S. Dist. LEXIS 176045, *6 (W.D. Wis. 2023).

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's judgment in favor of Appellees.

66

## REQUEST FOR ORAL ARGUMENT

The Family requests oral argument. The factual record is large and important for any review of the decisions rendered by Premera. In addition, this Circuit's review of the requirements imposed on ERISA claims administrators could reasonably affect the rights of several million participants of various ERISA Plans in this Circuit, and the importance of these issues warrants oral argument before the Court.

Respectfully submitted,

/s/ *Brian S. King*
Brian S. King (Utah Bar No. 4610)
BRIAN S. KING, P.C.
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: 801-532-1739
Facsimile: 801-532-1936
brian@briansking.com

*Counsel for Appellees*

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form08instructions.pdf

**9th Cir. Case Number(s)** | 24-560 and 24-757

I am the attorney or self-represented party.

**This brief contains** | 13,977 | **words,** including | 0 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

(●) complies with the word limit of Cir. R. 32-1.

( ) is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

( ) is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

( ) is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

( ) complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.
[ ] a party or parties are filing a single brief in response to multiple briefs.
[ ] a party or parties are filing a single brief in response to a longer joint brief.

( ) complies with the length limit designated by court order dated [            ].

( ) is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/Brian S. King | **Date** | 10/07/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 8**                                             *Rev. 12/01/22*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** 24-560 and 24-757

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

Appellees' Answering Brief

**Signature** s/Brian S. King  **Date** 10/07/2024

*(use "s/[typed name]" to sign electronically-filed documents)*

Feedback or questions about this form? Email us at forms@ca9.uscourts.gov

Form 15                                                              *Rev. 12/01/2018*